UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEURIG GREEN MOUNTAIN, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHARKNINJA OPERATING LLC, RONALD DIFABIO, and STEPHEN TURNER, <br><br> Defendants. | Civil Action No. 17-12133 |

## VERIFIED COMPLAINT

Plaintiff Keurig Green Mountain, Inc. ("Keurig"), by and through its attorneys, and for its Complaint against Defendants SharkNinja Operating LLC ("SharkNinja"), Ronald DiFabio ("DiFabio"), and Stephen Turner ("Turner"), hereby states as follows:

## INTRODUCTION

1.      Keurig and SharkNinja are direct competitors in the personal beverage consumer appliance industry, i.e., "coffee machines."  Keurig brings this action as result of SharkNinja's aggressive raiding of Keurig's employees and Keurig's confidential information and trade secrets.  SharkNinja has actively solicited and, in some cases, hired multiple Keurig employees, including but not limited to Defendants DiFabio and Turner, in blatant violation of their post-employment restrictive covenants with Keurig.  DiFabio and Turner, for their part, have disregarded their contractual, statutory and common law obligations to Keurig, and thus Keurig seeks injunctive and other relief and damages from SharkNinja and the individual defendants.

2.      In a recent effort to rapidly build up its workforce following its development of beverage appliances competitive with Keurig, SharkNinja has focused its sights on Keurig

employees or former employees, despite knowing that they are bound by post-employment restrictive covenants with Keurig. One such employee is DiFabio, a former Keurig Senior Vice President who managed an extensive sales organization at Keurig.

3.     Upon information and belief, to date, DiFabio and SharkNinja have unlawfully solicited, directly or indirectly, more than six (6) current or former Keurig employees to join SharkNinja.

4.     Moreover, upon information and belief, and in violation of his agreements with Keurig and his legal obligations, DiFabio (and later Turner) took with him Keurig's confidential and proprietary information and misappropriated confidential and proprietary data from Keurig's computer systems.

5.     When Keurig learned in the fall of 2016 that DiFabio intended to commence employment with SharkNinja in violation of his restrictive covenants, Keurig immediately informed both DiFabio and SharkNinja that it objected to DiFabio's employment with Shark Ninja and that it intended to enforce the terms of its agreements with DiFabio. As part of letter agreements negotiated and eventually executed by DiFabio and SharkNinja in December, 2016, DiFabio would be permitted to commence employment with SharkNinja on January 1, 2017, which was during his one-year non-compete period, but both DiFabio and SharkNinja agreed that DiFabio would not have any involvement in or direct connection with any of SharkNinja's products which compete with Keurig's products, *i.e.*, coffee appliances and related coffee products, and, further that DiFabio would not solicit Keurig employees or customers for the remainder of his non-solicitation period, which would have ended on March 27, 2017 (and would otherwise comply with his other contractual obligations to Keurig, as set forth below).

6.      Nevertheless, in violation of DiFabio's and SharkNinja's promises and legal obligations, despite Keurig's reliance thereon, and unknown to Keurig, DiFabio's and SharkNinja's raiding continued, this time in direct and knowing violation of their legal obligations to Keurig.  In particular, in early 2017, DiFabio, on SharkNinja's behalf, solicited Turner, a Strategic Account Manager at Keurig, to leave Keurig in order to join SharkNinja.  In fact, DiFabio met with Turner on March 15, 2017 as part of Turner's day-long interview process with SharkNinja.  Turner resigned from Keurig on March 30, 2017, and has commenced employment with SharkNinja despite his post-employment restrictive covenants.

7.      In addition, DiFabio:  removed electronic files containing Keurig's confidential business information and trade secrets from Keurig's electronic systems and "migrated" them to SharkNinja's electronic systems (and used them to perform his job duties at SharkNinja); has retained numerous other hard copies of Keurig documents which he failed to return to Keurig upon his separation from employment; and, in the fall of 2016 emailed Keurig employees (including his former administrative assistant) and requested that they forward to him highly confidential and proprietary Keurig documents to his personal email address (including Keurig organizational charts and contact lists containing contact information for the merchandising departments of Keurig's key customers).

8.      Before his resignation, Turner also took with him and misappropriated from Keurig highly sensitive, competitive, marketing and sales records and presentations which constitute Keurig's confidential information and which he remains legally obligated to return.

9.      In order to seek redress from this unlawful conduct, and to obtain the immediate return of its confidential and proprietary information, Keurig requests that this Court issue the injunction and award Keurig its damages, attorneys' fees and other relief requested below.

**THE PARTIES**

10.     Plaintiff Keurig is a Delaware corporation with its principal place of business in Vermont.  Keurig maintains a corporate office location in Burlington, Massachusetts.  Keurig is the successor to Keurig, Incorporated.

11.     Defendant SharkNinja is Delaware corporation with its principal place of business in Needham, Massachusetts.  In addition to its corporate offices in Massachusetts, SharkNinja maintains locations in the United Kingdom, China, Canada, Alabama, Arkansas, and California.

12.     Defendant Ronald DiFabio, upon information and belief, is a resident and citizen of Weymouth, Massachusetts.

13.     Defendant Stephen Turner, upon information and belief, is a resident and citizen of Mooresville, North Carolina.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  More specifically, this action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and this Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendant SharkNinja because its principal place of business is located in Massachusetts, and over Defendant DiFabio because he is domiciled in Massachusetts.  This Court has personal jurisdiction over Defendant Turner because, during the course of his employment with Keurig, he regularly conducted business in Massachusetts and entered into contracts in Massachusetts.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Plaintiff maintains an office in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### DiFabio Joins Keurig as a Sales Executive and Agrees to Post-Employment Restrictive Covenants As Part of His Employment and in Exchange for a Highly Lucrative Equity Award.

17. Keurig sells hot beverage brewing appliances and beverages for use in such appliances, including single serve coffee, hot cocoa and tea pods. Keurig's products are sold at major retailers, as well as directly to consumers.

18. DiFabio commenced employment with Keurig in 2008. His first position with Keurig was as a Vice President, Retail Sales. In 2013, he was promoted to the position of Senior Vice President, U.S. Sales. During his employment with Keurig, DiFabio served in an executive sales role, developing and implementing confidential and competitive sales strategies, business analytics, and operational policies. On behalf of Keurig, DiFabio cultivated high-level relationships with major retailers and negotiated confidential terms and conditions of Keurig's agreements with its retailers. As the Senior Vice President for U.S. Sales, DiFabio led five sales teams, and over 40 Keurig employees reported to him.

19. During DiFabio's employment, Keurig provided DiFabio with extensive access to its confidential information and trade secrets in order to enable him to perform his senior executive role with Keurig.

20. Upon commencing his employment with Keurig, DiFabio agreed to a Confidentiality Agreement ("DiFabio Confidentiality Agreement"). A true and correct copy of the DiFabio Confidentiality Agreement is attached hereto as Exhibit A. The DiFabio

Confidentiality Agreement expressly states that DiFabio's offer of employment from Keurig, the compensation to be paid to him as an employee, and Keurig's willingness to allow him access to its confidential information, as well as other good and valuable consideration, supported its enforceability. Ex. A, DiFabio Confidentiality Agreement, Intro Paragraph.

21. Pursuant to his Confidentiality Agreement, DiFabio was obligated, among other things, not to, for a period of one year following his termination of employment from Keurig for any reason or no reason:

a. "[P]articipate in the development and provision of goods or services which are similar to or competitive with goods or services provided . . . by [Keurig], without the express written authorization of the President of the Company;"

b. "[S]olicit, induce, attempt to hire, or hire any employee of [Keurig] (or any person who was employed by [Keurig] at any time during the last six months of [his] employment with [Keurig]), or assist in such hiring by any other person or business entity, or encourage any such employee to terminate his or her employment with [Keurig];" and

c. "[C]ompete for, or engage in the solicitation of, any customer or prospective customer (with respect to products or services competitive with [Keurig's] products or services), that [Keurig] has, during the one year immediately preceding such termination of employment . . .

Id., DiFabio Confidentiality Agreement, ¶ 1.

22. In addition, in the DiFabio Confidentiality Agreement, DiFabio promised that he would not, at any time, "directly or indirectly, use any Confidential Information (as hereinafter

defined), other than pursuant to my employment [with Keurig], or disclose to anyone outside of [Keurig] any such Confidential Information." DiFabio further agreed that if he ceased to be employed by Keurig at any time, he would immediately return any property belonging to Keurig.

Id., DiFabio Confidentiality Agreement, ¶ ¶ 2, 8.

23. The term "Confidential Information" is defined as including, *inter alia*:

"[A]ll trade secrets, proprietary information and other data and information (and any tangible evidence, record or representation thereof) . . . which is in possession of [Keurig] (whether or not the property of [Keurig], which in any way relates to the present or future business of [Keurig], which is maintained in confidence by [Keurig], or which might permit [Keurig] or its customers to obtain a competitive advantage over competitors who do not have access to such trade secrets, proprietary information, or other data or information."

Id., DiFabio Confidentiality Agreement, ¶ 2.

24. The DiFabio Confidentiality Agreement further states that Confidential Information includes, *inter alia*, the following:

"[T]he name of any customer, vendor, consultant, employee, prospective customer or consultant, any sales plan, marketing material, plan or survey, business plan or opportunity, or product or development plan or specification, business proposal, financial record, or business record or other record or information relating to the present or proposed business of [Keurig.]"

Id., DiFabio Confidentiality Agreement, ¶ 2.

25. Keurig is the owner of the Confidential Information, and Keurig has taken reasonable efforts to maintain the secrecy of its Confidential Information, which efforts include, but are not limited to, the following: (i) requiring employees to sign a confidentiality agreement; (ii) requiring certain employees (including DiFabio and Turner) to sign agreements containing protective covenants including provisions prohibiting certain competitive and solicitation activities during and after employment; (iii) implementing a code of conduct that requires employees to maintain the confidentiality of information that the employee learns in the scope of

his or her employment; (iv) marking as confidential presentations and documents distributed to customers and business partners; (v) requiring employees to secure their employment-related electronic devices by passwords and other methods; and (vi) requiring that employees agree to return all Keurig property, including Confidential Information, documents and materials upon separation from employment with Keurig.

26.     Since Keurig sells its products throughout the United States and worldwide, the Confidential Information relates to Keurig's products and services used in, or intended for use in, interstate and foreign commerce.  Additionally, given that the Confidential Information is maintained in confidence by Keurig and its employees, the Confidential Information is not generally known to, and not readily ascertainable through proper means, by other persons who can obtain economic value for the disclosure or use of the Confidential Information.  Further, the Confidential Information has independent economic value as it provides Keurig with an advantage over its competitors, including but not limited to SharkNinja.

27.     During the course of his employment, DiFabio was eligible for significant awards of equity in Keurig, both in the form of options and restricted stock units in exchange for his execution of equity award agreements that contained certain restrictions, including post-employment restrictions.

28.     The most recent such equity award agreement was in 2015.  In 2015, DiFabio entered into a Restricted Stock Unit Award Agreement ("2015 RSU Agreement") with Keurig. A true and correct copy of the 2015 RSU Agreement is attached hereto as <u>Exhibit B</u>.

29.     Pursuant to and in accordance with the terms of the RSU Agreement, and in exchange for a grant of 1,866 restricted stock units of Keurig, DiFabio reaffirmed and agreed to expanded post-employment restrictions.  In particular, as part of the 2015 RSU Agreement,

DiFabio agreed that he would not, for a period of 12 months following his termination of employment with Keurig, for whatever reason:

> a.  "[W]ork for . . . any entity engaged in the same or similar business as [Keurig];"
>
> b.  "Directly or indirectly, solicit, hire, recruit, attempt to solicit, hire or recruit, or otherwise induce the termination of employment of any employee of [Keurig] . . . or assist any other person or entity to do any of the foregoing . . .;" and
>
> c.  "[D]irectly or indirectly solicit . . . any customers of [Keurig] . . . for purposes of offering . . . any goods or services similar to or competitive with those currently offered by [Keurig] . . .".

Ex. B., 2015 RSU Agreement, ¶ 10.

30.  In the event of a breach of the 2015 RSU Agreement by DiFabio, he agreed that any unvested portion of the restricted stock award would be forfeited, *and any profits or gains realized by DiFabio would be subject to clawback*. Id., 2015 RSU Agreement, ¶ ¶ 10.2, 11. In addition, DiFabio agreed that in the event that he breached the 2015 RSU Agreement, Keurig would be entitled to, *inter alia*, injunctive or other equitable relief. Id., 2015 RSU Agreement, ¶ 10.2.

31.  As a result of a Keurig corporate transaction that closed in March, 2016, DiFabio received $171,672 (gross) for his 1,866 restricted stock units in Keurig. In total, as a result of this corporate transaction, on or about March 3, 2016 DiFabio received more than *$1,137,000* (gross) for his restricted stock units and options that were provided in exchange for his execution

of award agreements that contained the same or similar post-employment restrictions as set forth in the 2015 RSU Agreement.

**DiFabio Accepts Employment with SharkNinja in Violation of His Restrictive Covenants, and DiFabio and SharkNinja Execute Letter Agreements with Keurig.**

32.     Effective March 27, 2016, DiFabio resigned from employment with Keurig. Upon his departure, on information and belief, DiFabio took with him and has retained Keurig's proprietary information, including but not limited to Confidential Information as defined in the DiFabio Confidentiality Agreement.   DiFabio's failure to return Keurig's Confidential Information and misappropriation thereof constitutes a violation of the DiFabio Confidentiality Agreement.

33.     In 2015, on information and belief, SharkNinja changed its name from Euro-Pro Operating, LLC, to SharkNinja.  SharkNinja also signed a lease for a new corporate headquarters in Needham, Massachusetts in 2015 and announced in a press release at that time that it was engaging in "aggressive recruitment efforts" to add to its employee ranks.  SharkNinja's coffee maker appliances directly compete with Keurig's products for direct customer sales, distribution, and shelf space at retailers.

34.     Keurig understands that, to date, SharkNinja has solicited countless Keurig employees, and has hired at least the following former Keurig employees:  Brie Miller, Ron DiFabio, Eric Fireman, Karen Gallagher, Chad Collett, Alounsak Sivongsay, and Turner.

35.     In the fall of 2016, DiFabio informed Keurig that he intended to commence employment with SharkNinja.  Keurig contacted both DiFabio and SharkNinja to preserve its rights and to inform both parties that DiFabio was prevented, by the terms of his restrictive agreements, from commencing employment with SharkNinja prior to March 27, 2017.  In an

effort to preserve its legitimate business interests and achieve a reasonable resolution to the dispute, Keurig entered into letter agreements as regards DiFabio's employment with SharkNinja in December, 2016. True and accurate copies of Keurig's letter agreements executed by the parties in December, 2016 are attached hereto as Exhibit C (the "DiFabio Letter Agreement") and Exhibit D (the "SharkNinja Letter Agreement") (collectively, the "Letter Agreements") respectively.

36.     The Letter Agreements provided that, *inter alia*, while DiFabio would be permitted to commence employment with SharkNinja before the expiration of his non-competition and non-solicitation restriction on March 27, 2017 (starting January 1, 2017), he would not, *inter alia*, be involved or have any connection with products that compete with Keurig's products, such as Keurig's coffee brewing systems. See Ex. C, DiFabio Letter Agreement, ¶ 6; Ex. D, SharkNinja Letter Agreement, ¶ 5.

37.     Moreover, the SharkNinja Letter Agreement also provided that:

> "SharkNinja has not hired Mr. DiFabio with the intention of inducing or permitting him to violate the employee and customer non-solicitation provisions set forth in the [RSU agreement], and until no earlier than March 27, 2017, SharkNinja will not encourage, induce or permit Mr. DiFabio to: (i) directly or indirectly solicit, hire, recruit, attempt to solicit, hire, or recruit, or otherwise induce the termination of employment of any employee of Keurig or its affiliates or assist any other person or entity to do any of the foregoing . . ."

Ex. D., SharkNinja Letter Agreement, ¶ 7. Similarly, DiFabio promised that he would not, until March 27, 2017, "directly or indirectly solicit, hire, recruit, attempt to solicit, hire or recruit, or otherwise induce the termination of employment of any employee of Keurig . . . or assist any other person or entity to do any of the foregoing." Ex. C, DiFabio Letter Agreement, ¶ 9.

38.     The Letter Agreements also stated that Keurig would continue monitoring SharkNinja's and Mr. DiFabio's activities for any further unlawful conduct, and if Keurig found

such evidence, it reserved its rights to initiate legal action and to seek any and all available remedies against SharkNinja and/or DiFabio.  Ex. C, DiFabio Letter Agreement, p. 4; Ex. D., SharkNinja Letter Agreement, pp. 3-4.

39.     In reliance on DiFabio's and SharkNinja's signing the Letter Agreements and complying with their obligations therein, Keurig did not take any further action at that time.

### DiFabio and SharkNinja Blatantly Disregard Their Contractual and Legal Obligations to Keurig.

40.     Unknown to Keurig, and despite the Letter Agreements executed by DiFabio and SharkNinja that stated otherwise, DiFabio, armed with Keurig's Confidential Information, had already begun soliciting and continued to solicit, directly and indirectly, current and former Keurig employees to join him at SharkNinja.

41.     SharkNinja's former "Senior Director of Global Talent Acquisition," Brie Miller, is also a former Keurig employee.  Upon information and belief, Ms. Miller worked closely with and communicated with DiFabio regarding SharkNinja's recruitment efforts to orchestrate a scheme to allow DiFabio to indirectly solicit Keurig employees and/or build a team of former Keurig employees, in violation of his and SharkNinja's legal obligations to Keurig.

42.     DiFabio met with Turner on March 15, 2017, while Turner was actively employed with Keurig, as part of a day-long interview process wherein DiFabio and SharkNinja were attempting to convince Turner to resign from Keurig and join SharkNinja, all in direct violation of their contractual and legal obligations to Keurig.

43.     Starting in the Fall of 2016 (or earlier), DiFabio also emailed multiple Keurig employees at their Keurig email addresses requesting that they provide him Keurig's information about the merchandising teams at several of Keurig's retail customers as well as Keurig

organizational charts. DiFabio sought this information from Keurig's computer systems so that he could use it to solicit Keurig's customers on SharkNinja's behalf.

44.     DiFabio additionally removed at least nine electronic files containing Keurig's confidential business information and/or trade secrets from Keurig's electronic systems and loaded them, or "migrated them," onto SharkNinja's electronic systems (and used them to perform his job duties at SharkNinja). DiFabio, moreover, has in his home office additional hard copies of Keurig documents which he failed to return to Keurig upon his separation from employment. Despite Keurig's demands, DiFabio and SharkNinja have not turned over to Keurig its files.

45.     DiFabio and SharkNinja also did not comply with their obligations to ensure that DiFabio had no connection or involvement with any coffee products at SharkNinja. Prior to March 27, 2017, DiFabio not only received and was involved in reviewing business information regarding SharkNinja's coffee products and business, but that he also managed and supervised the sales staff responsible for the coffee business unit at SharkNinja, despite the prohibition against such activities in the Letter Agreements. In fact, upon information and belief, DiFabio actually reviewed sales data for the SharkNinja coffee products and "weighed in" on and made written recommendations regarding SharkNinja's coffee business.

46.     Finally, prior to March 27, 2017, DiFabio attended multiple meetings and conference calls with SharkNinja sales teams and/or customers (which are also Keurig customers) at which SharkNinja was "pitching" and discussing its coffee products. This conduct is in direct violation of DiFabio's and SharkNinja's legal and contractual obligations to Keurig.

47.     At a minimum, SharkNinja took absolutely no steps to implement, enforce or police DiFabio's compliance with the terms of the Letter Agreement which it entered with

Keurig in December of 2016. Alternatively, SharkNinja intentionally negotiated and entered into the Letter Agreement in bad faith, and then disregarded its obligations under the Letter Agreement, knowing that it had lulled Keurig into a false sense of comfort that SharkNinja and DiFabio had ceased their unlawful activities.

**Turner Accepts an Offer of Employment with SharkNinja and Misappropriates Keurig's Confidential Information in Violation of His Confidentiality Agreement.**

48.     Turner began working for Keurig in 2011 within the sales organization in a management role. His last role for Keurig was as a Strategic Account Manager, where he was provided with extensive access to Keurig's confidential information and trade secrets, including but not limited to pricing, sales targets and strategies, customer needs, and confidential product plans for some of Keurig's largest customers, including confidential information about products that are not yet available to the public.

49.     On March 30, 2017, Turner submitted his resignation to Keurig. During discussions regarding his resignation, Turner first asserted that his decision had nothing to do with DiFabio. However, Turner later admitted that he had accepted an offer of employment with SharkNinja that he had received as a result of his interviews with DiFabio and others at SharkNinja on March 15, 2017. Turner commenced employment with SharkNinja in August, 2017.

50.     Like DiFabio, Turner, upon commencing his employment with Keurig, executed the Keurig Confidentiality Agreement ("Turner Confidentiality Agreement"). A true and correct copy of the Turner Confidentiality Agreement is attached hereto as Exhibit E. The Turner Confidentiality Agreement expressly states that Turner's offer of employment from Keurig, the compensation to be paid to him as an employee, and Keurig's willingness to allow him access to

its confidential information, as well as other good and valuable consideration, supported its enforceability. <u>Ex. E</u>, Turner Confidentiality Agreement, Intro Paragraph.

51.     Pursuant to his Confidentiality Agreement, Turner was obligated, among other things, not to, for a period of one year following his termination of employment from Keurig for any reason or no reason:

     a.     "[P]articipate in the development and provision of goods or services which are similar to or competitive with goods or services provided . . . by [Keurig], without the express written authorization of the President of the Company;"

     b.     "[S]olicit, induce, attempt to hire, or hire any employee of [Keurig] (or any person who was employed by [Keurig] at any time during the last six months of [his] employment with [Keurig]), or assist in such hiring by any other person or business entity, or encourage any such employee to terminate his or her employment with [Keurig];" and

     c.     "[C]ompete for, or engage in the solicitation of, any customer or prospective customer (with respect to products or services competitive with [Keurig's] products or services), that [Keurig] has, during the one year immediately preceding such termination of employment . . .

<u>Id.</u>, Turner Confidentiality Agreement, ¶1.

52.     In addition, in the Turner Confidentiality Agreement, Turner promised that he would not, at any time, "directly or indirectly, use any Confidential Information (as hereinafter defined), other than pursuant to my employment [with Keurig], or disclose to anyone outside of [Keurig] any such Confidential Information."   Turner further agreed that if he ceased to be

employed by Keurig at any time, he would immediately return any property belonging to Keurig.

Id., Turner Confidentiality Agreement, ¶ ¶ 2, 8.

53.     The term "Confidential Information" is defined in the Turner Confidentiality

Agreement as including, *inter alia*:

> "[A]ll trade secrets, proprietary information and other data and information (and any tangible evidence, record or representation thereof) . . . which is in possession of [Keurig] (whether or not the property of [Keurig]), which in any way relates to the present or future business of [Keurig], which is maintained in confidence by [Keurig], or which might permit [Keurig] or its customers to obtain a competitive advantage over competitors who do not have access to such trade secrets, proprietary information, or other data or information."

Id., Turner Confidentiality Agreement, ¶ 2.

54.     The Turner Confidentiality Agreement further states that Confidential Information

includes, *inter alia*, the following:

> "[T]he name of any customer, vendor, consultant, employee, prospective customer or consultant, any sales plan, marketing material, plan or survey, business plan or opportunity, or product or development plan or specification, business proposal, financial record, or business record or other record or information relating to the present or proposed business of [Keurig.]"

Id., Turner Confidentiality Agreement, ¶2.

55.     Turner violated his Confidentiality Agreement by emailing, to his personal email

account, and a short time before his resignation, Keurig's Confidential Information, including

highly confidential business, marketing and sales plans prepared by Keurig relating to one of

Keurig's largest customers, Bed Bath & Beyond, which included a power point presentation to

the customer.   Despite Keurig's demand that Turner return any and all Keurig property,

including all Confidential Information and the electronic documents he emailed to his personal

email address, Turner has not returned any documents whatsoever to Keurig.

56.     Turner's improper conduct has caused damage and loss to Keurig.

57.    It is inevitable that Turner will use and/or disclose Keurig's Confidential Information in connection with his employment at SharkNinja.  Moreover, due to the competitive relationship between Keurig and SharkNinja, Turner's use and/or disclosure of the Confidentiality Information in connection with his employment with SharkNinja would be detrimental and cause irreparable harm to Keurig

## CAUSES OF ACTION

### COUNT I
### Breach of Contract – DiFabio

58.    Keurig repeats, realleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

59.    The DiFabio Confidentiality Agreement, the RSU Agreement and the DiFabio Letter Agreement are binding and enforceable contracts that contain reasonable restrictive covenants that are necessary to protect Keurig's legitimate business interests.

60.    Keurig has at all times fulfilled its obligations, if any, under the DiFabio Confidentiality Agreement, the RSU Agreement and the DiFabio Letter Agreement.

61.    DiFabio has violated and is continuing to violate the DiFabio Confidentiality Agreement, the RSU Agreement and the DiFabio Letter Agreement as described above.

62.    As a direct and proximate result of DiFabio's unlawful conduct, Keurig has been damaged, and DiFabio is therefore liable to Keurig in an amount to be determined by the Court, together with costs and interest as allowable by law.  In addition, Keurig is entitled to specific enforcement of the terms of the DiFabio Confidentiality Agreement and the RSU Agreement.

### COUNT II
### Breach of Contract – SharkNinja

63.     Keurig repeats, realleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

64.     The SharkNinja Letter Agreement is a binding and enforceable contract.

65.     Keurig has at all times fulfilled its obligations, if any, under the SharkNinja Letter Agreement.

66.     SharkNinja violated the SharkNinja Letter Agreement as described above.

67.     As a direct and proximate result of SharkNinja's unlawful conduct, Keurig has been damaged, and SharkNinja is therefore liable to Keurig in an amount to be determined by the Court, together with costs and interest as allowable by law.

## COUNT III
## Breach of Contract – Turner

68.     Keurig repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

69.     The Turner Confidentiality Agreement is a binding and enforceable contract.

70.     Keurig has at all times fulfilled its obligations, if any, under the Turner Confidentiality Agreement.

71.     Turner has violated and is continuing to violate the Turner Confidentiality Agreement as described above.

72.     As a direct and proximate result of Turner's unlawful conduct, Keurig has been damaged, and Turner is therefore liable to Keurig in an amount to be determined by the Court, together with costs and interest as allowable by law.  In addition, Keurig is entitled to specific enforcement of the Turner Confidentiality Agreement.

## COUNT IV
### Intentional Interference with Contractual and/or
### Advantageous Relationships – DiFabio and SharkNinja

73.     Keurig repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

74.     Keurig had a contractual and/or advantageous relationship with Turner and DiFabio.  DiFabio and SharkNinja were aware of that contractual and/or advantageous relationship.

75.     Without privilege or justification, DiFabio and SharkNinja maliciously, purposefully and intentionally interfered with, and are continuing to interfere with Keurig's relationship with Turner through improper means and/or with improper motive.  Without privilege or justification, SharkNinja maliciously, purposefully and intentionally interfered with, and is continuing to interfere with Keurig's relationship with DiFabio through improper means and/or with improper motive.

76.     DiFabio's and SharkNinja's tortious interference with Keurig's contractual and/or advantageous relationship has caused and will continue to cause damage to Keurig.

77.     As a consequence thereof, DiFabio and SharkNinja are liable to Keurig in an amount to be determined by the Court, together with cost and interest as allowable by law.

## COUNT V
### Breach of the Implied Covenant of Good Faith and Fair Dealing – all Defendants

78.     Keurig repeats, realleges and incorporates by reference herein the allegations contained in the preceding paragraphs as if fully stated herein.

79.     All contracts under Massachusetts law include an implied covenant of good faith and fair dealing, which requires that neither party take any action that will deprive the other of

the benefit of the contract between them. Therefore, the DiFabio Confidentiality Agreement, the RSU Agreement, the DiFabio Letter Agreement, the SharkNinja Letter Agreement, and the Turner Confidentiality Agreement all contain an implied covenant of good faith and fair dealing.

80. Defendants acted, and continue to act, in bad faith in connection with their breaches of the covenant of good faith and fair dealing.

81. As a proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Keurig has and will continue to suffer damages.

82. As a consequence thereof, Defendants are liable to Keurig in an amount to be determined by the Court, together with cost and interest as allowable by law

**COUNT VI**
**Promissory Estoppel – DiFabio and SharkNinja**

83. Keurig repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

84. As detailed above, DiFabio and SharkNinja made promises, representations and assurances to Keurig with the intent that Keurig would rely on their promises and refrain from taking legal action to enforce its rights.

85. DiFabio's and SharkNinja's promises enabled DiFabio to continue, undeterred, his improper and unlawful conduct.

86. Keurig reasonably relied upon DiFabio's and SharkNinja's promises and representations and assurances and materially changed its position in reliance thereon.

87. Keurig relied to its detriment on DiFabio's and SharkNinja's promises and representations and assurances, and was substantially harmed thereby.

88. As a consequence thereof, DiFabio and SharkNinja are liable to Keurig in an amount to be determined by the Court, together with costs and interest as allowable by law.

## COUNT VII
## Violation of Chapter 93A – DiFabio and SharkNinja

89.     Keurig repeats, realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

90.     At all times material hereto, Defendants SharkNinja and DiFabio were engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§2 and 11.

91.     As alleged herein, SharkNinja and DiFabio (while employed with SharkNinja), while engaged in trade or commerce, intentionally, knowingly, willfully, recklessly and/or negligently committed unfair and deceptive acts and practices primarily and substantially in Massachusetts, and Keurig has suffered and will continue to suffer the loss of money and property as a result thereof.

92.     Defendants' actions, as alleged herein, constitute unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, §11, that are within the penumbra of common-law, statutory, or other established concepts of unfairness; are immoral, unethical, oppressive, and/or unscrupulous; and have caused substantial injury to Keurig.

93.     By virtue of the foregoing, SharkNinja and DiFabio are liable to Keurig for damages in an amount determined by the Court, together with up to three but not less than two times the amount of Keurig's actual damages, as well as costs, interest and attorneys' fees.

## COUNT VIII
## Violation of the Defend Trade Secrets Act – DiFabio and Turner

94.     Keurig repeats, realleges and incorporates by reference the allegations contained in each and all of the preceding Paragraphs as if fully stated herein.

95.     The Confidential Information as defined in the DiFabio Confidentiality Agreement and the Turner Confidentiality Agreement constitutes "trade secrets" within the

meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b). Keurig is entitled to and requests a declaratory judgment that the Confidential Information constitutes "trade secrets" within the meaning of the Defend Trade Secrets Act.

96. DiFabio and Turner obtained Keurig's trade secrets by improper means and have used them in breach of their obligations to Keurig. As described above, DiFabio's and Turner's conduct constitutes knowing, willful and malicious misappropriation. As a direct and proximate result of DiFabio's and Turner's conduct, Keurig has suffered irreparable harm and damage to its business operations. Unless restrained by this Court, DiFabio and Turner will cause further irreparable harm to Keurig.

97. Under the Defend Trade Secrets Act, Keurig is entitled to and requests permanent injunctive relief against DiFabio and Turner to prohibit their actual, threatened, and/or inevitable misappropriation of the Confidential Information. This injunctive relief should include, without limitation, an Order prohibiting DiFabio and Turner from using and disclosing any Confidential Information in any manner, including but not limited to SharkNinja. Further, this injunctive relief should include an Order requiring DiFabio and Turner to return to Keurig any and all Confidential Information and/or trade secrets.

98. Pursuant to the Defend Trade Secrets Act, to the extent that DiFabio and/or Turner have misappropriated the Confidential Information, Keurig is entitled to and requests an award of damages in its favor for damages for actual loss caused by the misappropriation of the Confidential Information, damages for all unjust enrichment caused by the misappropriation of the Confidential Information that is not addressed in computing damages for actual loss, and/or the damages caused by the misappropriation measured by imposition of liability for a reasonable

royalty for the unauthorized disclosure or use of the Confidential Information, which amounts, exclusive of interests and costs.

99. Pursuant to the Defend Trade Secrets Act and other applicable law, Keurig is entitled to and requests an award of attorney's fees and costs incurred in the prosecution of this action.

## COUNT IX
## Violation of the Computer Fraud and Abuse Act – DiFabio and Turner

100. Keurig repeats, realleges and incorporates by reference the allegations contained in each and all of the preceding Paragraphs as if fully stated herein.

101. DiFabio and Turner voluntarily entered into the DiFabio and Turner Confidentiality Agreements with Keurig, respectively. DiFabio and Turner agreed and promised that they would return and not disclose, except in the performance of their duties for Keurig, Keurig's Confidential Information, as that term is defined in the DiFabio and the Turner Confidentiality Agreements.

102. Keurig provided DiFabio and Turner with access to its confidential and proprietary information in reliance upon their agreement to the terms of their Confidentiality Agreements.

103. Through the conduct described above, DiFabio knowingly, and with the intent to defraud Keurig, improperly accessed Keurig's proprietary and confidential electronic data that is stored on its secure and protected databases. On information and belief, DiFabio accessed that information in order to assist in a competitive business.

104. Through the conduct described above, DiFabio acted without access and/or he exceeded his authorized access to Keurig's computers and protected databases by seeking and

obtaining that information from third parties following his termination of employment with Keurig. DiFabio has failed to return Keurig's Confidential Information even after demand.

105. Through the conduct described above, Turner knowingly, and with the intent to defraud Keurig, improperly accessed Keurig's proprietary and confidential electronic data that is stored on its secure and protected databases. On information and belief, Turner accessed that information in order to assist in a competitive business.

106. Through the conduct described above, Turner acted without access and/or he exceeded his authorized access to Keurig's computers and protected databases by sending Keurig's Confidential Information to his home email address. Turner has failed to return Keurig's Confidential Information even after demand.

107. As a direct result of DiFabio's and Turner's actions in accessing Keurig's computer and electronic file systems and networks without authorization, or in excess of their authorization, Keurig has suffered damages and/or loss exceeding $5,000 within a one-year period.

108. Pursuant to the Computer Fraud and Abuse Act, Keurig is entitled to and requests an award of compensatory damages and injunctive and other equitable relief for the return of its confidential and proprietary information misappropriated by DiFabio and/or Turner.

**COUNT X**
**Misappropriation of Trade Secrets under Massachusetts Gen. Law c.93, §42 *et seq*.**
**All Defendants**

109. Keurig repeats, realleges and incorporates by reference the allegations contained in each and all of the preceding Paragraphs as if fully stated herein.

110. The trade secrets which Keurig seeks to protect include the Confidential Information as defined by the DiFabio Confidentiality Agreement and the Turner Confidentiality

Agreement, such as proprietary information about customers, financial data, business information, and marketing information, which gives Keurig an opportunity to obtain a competitive advantage over competitors who do not have this information. This information is not generally known or readily ascertainable through independent development. This information constitutes trade secrets that are protected under Massachusetts statutory and common law.

111. Keurig has taken reasonable steps to preserve the secrecy of its trade secrets and confidential information.

112. As described above, DiFabio and Turner obtained these trade secrets by improper means in breach of their obligations to Keurig, and DiFabio further migrated Keurig's trade secrets onto SharkNinja's computer systems for SharkNinja's benefit.

113. As described above, DiFabio, Turner and SharkNinja have engaged in a "misappropriation" or "intended or threatened misappropriation" of Keurig's trade secrets.

114. The foregoing conduct of DiFabio was willful and malicious.

115. The foregoing conduct of Turner was willful and malicious.

116. The foregoing conduct of SharkNinja was willful and malicious.

117. By virtue of their conduct described above, DiFabio, Turner and SharkNinja have misappropriated or are seeking to misappropriate and misuse Keurig's confidential, trade secret information in violation of common law and Massachusetts statutory law.

118. As a direct and proximate result of DiFabio's, Turner's, and SharkNinja's unlawful conduct, Keurig has been injured and will suffer irreparable harm and damage to its business operations.

119.    As a consequence thereof, DiFabio, Turner and SharkNinja are liable to Keurig in amounts to be determined by the Court, together with interests, costs, punitive damages, and attorneys' fees to the extent permitted by law, and are subject to the injunctive relief as requested herein.

## PRAYERS FOR RELIEF

WHEREFORE, Keurig respectfully requests that this Court:

1.    Enter judgment in favor of Keurig on all Counts;

2.    Order the defendants to pay damages to Keurig in an amount determined by the Court, including all costs, interest, multiple damages and attorneys' fees allowed by contract and/or law;

3.    Enter a temporary, preliminary and permanent injunction requiring the defendants, and all persons acting in concert with them, to:

    a.    immediately cease and desist from accessing, using, and/or disclosing any and all Keurig confidential or proprietary information, including Confidential Information, trade secrets and/or any of the documents and materials referenced herein obtained by DiFabio and/or Turner in the course of or as a result of their employment with Keurig;

    b.    immediately return to Keurig any and all Keurig confidential or proprietary information, including Confidential Information, trade secrets, and/or any of the documents and materials referenced herein (including all copies, extract and summaries), in hardcopy form in the possession, custody or control of any of the defendants;

c.   preserve and maintain any and all Keurig confidential or proprietary information, including Confidential Information, trade secrets, and/or any of the documents and materials referenced herein (including all copies, extract and summaries), in electronic form in the possession, custody or control of any of the defendants ("Electronically-Stored Information");

d.   immediately provide a copy of all Electronically-Stored Information to Keurig;

e.   after the defendants have provided a copy of all Electronically-Stored Information to Keurig, and after receiving express written permission and direction from Keurig, the defendants shall permanently delete all Electronically-Stored Information in their possession, custody or control; and

f.   after complying with the terms of Paragraph e above, the defendants shall provide Keurig affidavits, in a form provided by Keurig, affirming that the defendants have satisfied the requirements of Paragraph e above;

4.   Grant Keurig such other and further relief as the Court deems just and equitable.

**JURY TRIAL DEMAND**

Keurig respectfully demands a trial by jury as to all claims that may be tried to a jury.

Respectfully submitted,

KEURIG GREEN MOUNTAIN, INC.,

By its attorneys,

*/s/ Julie B. Brennan*_____
Julie B. Brennan (BBO # 564101)
Karen D. Lane (BBO #630069)
Manchel & Brennan, P.C.
100 River Ridge Drive, Suite 308
Norwood, MA  02062
(617) 796-8920
jbrennan@manchelbrennan.com
klane@manchelbrennan.com

Dated:  October 31, 2017

## VERIFICATION

I, Derek Hopkins, President, US Commercial, state that I have read the foregoing
Verified Complaint entitled *Keurig Green Mountain, Inc. v. SharkNinja Operating LLC, Ronald
DiFabio and Stephen Turner*, that I am authorized to make this Verification on Plaintiff's behalf,
and that the factual allegations in Paragraph Nos. 1-10, and 14-53 herein are true and based on
personal knowledge or information available to me which I believe to be true to the best of my
knowledge, information and belief. This statement is made subject to the penalties of 28 U.S.C.
§ 1746 relating to unsworn declarations under penalty of perjury.

Executed on October 30, 2017.

Derek Hopkins