# EXHIBIT B

January 08, 2016



# KEURIG GREEN MOUNTAIN, INC.
## RESTRICTED STOCK UNIT AWARD AGREEMENT

This Restricted Stock Unit ("**RSU**") Award Agreement (this "**Agreement**") is made and entered into as of December 01, 2015(the "**Grant Date**") by and between Keurig Green Mountain, Inc. (the "**Company**") and DiFabio, Ronald M (the "**Participant**"). This Agreement pertains to an award of RSUs pursuant to the terms of the Keurig Green Mountain, Inc. 2014 Omnibus Incentive Plan, as may be amended from time to time (the "**Plan**").

| | |
|---|---|
| **Participant:** | DiFabio, Ronald M |
| **Grant Date:** | December 01, 2015 |
| **Number of RSUs Granted:** | 1,866 |
| **Vesting Schedule:** | Subject to Section 4 of this Agreement, this Award will vest according to the following schedule:<br><br>• 33.33% of the RSUs will vest on the first anniversary of the Grant Date;<br><br>• 33.33% of the RSUs will vest on the second anniversary of the Grant Date; and<br><br>• 33.34% of the RSUs will vest on the third anniversary of the Grant Date. |

1. <u>Grant of RSUs</u>. The Company hereby grants to the Participant an award consisting of the aggregate number of RSUs set forth above (the "**Award**"). Each RSU represents the conditional right to receive, without payment but subject to the conditions and limitations set forth in this Agreement and the Plan, one share of Stock of the Company (each, a "**Share**", or together, the "**Shares**").

2. <u>Award Subject to Plan</u>. The Award is subject in its entirety to the provisions of the Plan,

which are incorporated herein by reference. Except as otherwise specifically stated herein, in the event of any conflict between this Agreement and the Plan, the terms of the Plan will control. Capitalized terms not explicitly defined in this Agreement but defined in the Plan will have the meanings ascribed to them in the Plan. For purposes of this Agreement, "**Employer**" means the entity (the Company or the Affiliate) that employs the Participant on the applicable date.

3. <u>Rights as Shareholder; Limits on Transfer</u>. Each RSU represents an unfunded and unsecured promise by the Company to deliver one Share to the Participant upon vesting of the RSU. The Participant will not have any rights of a shareholder with respect to any RSU (including any voting rights or rights with respect to dividends) unless and until the RSU vests and is settled by the issuance of a Share. Neither the RSUs nor the rights relating thereto may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant except upon the Participant's death to a beneficiary designated in writing by the Participant in accordance with procedures established by the Administrator or, if none, to the person to whom the RSU passes by will or the laws of descent and distribution.

4. <u>Vesting Periods; Vesting; Effect of Termination of Employment</u>.

4.1 The RSUs, unless earlier terminated or forfeited as provided herein or in the Plan, will have three (3) vesting periods, each starting on the Grant Date and ending on an anniversary of the Grant Date, either the first, second or third anniversary thereafter (each, a "**Vesting Period**" or collectively, "**Vesting Periods**"). Provided that the Participant remains in continuous Employment through the applicable vesting date, the RSUs will become vested with respect to 33.33% of the RSUs on the first anniversary of the Grant Date described above, 33.33% of the Shares set forth above on the second anniversary of the Grant Date and 33.34% of the Shares set forth above on the third anniversary of the Grant Date (each, a "**Vesting Date**") until the RSUs are one hundred percent (100%) vested on the last Vesting Date, that is, the third anniversary of the Grant Date.

4.2 Notwithstanding the foregoing vesting schedule, and subject to compliance with Section 10, the following provisions will apply:

(a) <u>Termination upon Participant's Death</u>. If the Participant's Employment terminates as a result of the Participant's death, any then unvested RSUs will immediately vest.

(b) <u>Termination upon Participant's Retirement</u>. If a Retirement-Eligible Participant's Employment terminates for any reason other than death, disability within the meaning of Section 4.2(e) of this Agreement or a termination for Cause, ("**Retirement**"), any then unvested RSUs will immediately vest. For purposes of this Agreement, a Participant will be considered a "**Retirement-Eligible Participant**" from and after the earliest date, if any, on which the Participant either (i) is at least fifty-five (55) years of age and has at least fifteen (15) years of service with the Company or any Affiliate of the Company (counting service with any entity that is an Affiliate of the Company only during such periods as it is an Affiliate of the Company, except as the Administrator may otherwise determine) ("retirement-eligibility service"), or (ii) is at least sixty (60) years of age and has at least five (5) years of retirement-

eligibility service.

(c) <u>Termination upon Participant's Involuntary Termination Not-for-Cause</u>. If the Employment of a Participant who is not a Retirement-Eligible Participant terminates as a result of the Participant's involuntary termination not-for-Cause, a number of RSUs that are unvested as of the date of such termination will immediately vest in an amount equal to (i) the product obtained by multiplying (A) the total number of RSUs granted under this Agreement by (B) a fraction, the numerator of which is the number of days in the period beginning on the Grant Date and ending on the six-month anniversary of the date of such termination of Employment, and the denominator of which is the number of days in the period beginning on the Grant Date and ending on the third anniversary of the Grant Date, minus (ii) the number of RSUs that had vested pursuant to the vesting schedule set forth in Section 4.1 as of the date of termination. Any unvested RSUs that do not vest after application of the preceding sentence will be immediately forfeited upon the effective date of such termination without any payment or consideration due by the Company or any Affiliate.

(d) <u>Termination upon Participant's Voluntary Termination or for Cause</u>. If the Employment of a Participant who is not a Retirement-Eligible Participant terminates due to the Participant's voluntary termination or if the Employment of the Participant (whether or not a Retirement-Eligible Participant) is terminated by the Employer for Cause, any then unvested RSUs will be immediately forfeited upon the effective date of such termination without any payment or consideration by the Company. For purposes of this Agreement, other than Section 4.2(f) and the definition of "Qualifying Termination," **"Cause"** has the meaning, if any, ascribed to it in an employment agreement between the Participant and the Employer in effect on the date the Participant terminates Employment or, if no such definition exists, means any or any combination of the following: (i) commission by the Participant of a crime involving moral turpitude, or of a felony; (ii) gross neglect by the Participant of his or her duties (other than as a result of incapacity resulting from physical or mental illness or injury) that continues for thirty (30) days after the Employer gives written notice to the Participant thereof; or (iii) an act of dishonesty or breach of faith in the conduct by the Participant of his or her duties for the Employer that is materially injurious to the Employer.

(e) <u>Vesting due to Disability</u>. If the Participant becomes disabled, any then unvested RSUs will immediately vest as of the date the Participant becomes disabled. For purposes of this Agreement, a Participant will be considered "disabled" at such time as the Administrator determines that the Participant is, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, (i) unable to engage in any substantial gainful activity, or (ii) receiving income replacement benefits for a period of not less than three (3) months under an Employer long-term disability plan.

(f) <u>Change in Control</u>. In the event a Participant who is not a Retirement-Eligible Participant experiences a "Qualifying Termination" as defined in the Company's Amended and Restated 2008 Change in Control Severance Benefit Plan as amended from time to time and as in effect on the date of termination (the **"CIC Severance Plan"**), any unvested RSUs will become fully vested in accordance with the terms of the CIC Severance Plan; it being

understood that if the Participant is a Retirement-Eligible Participant at the time of a Qualifying Termination, the RSUs will be treated as provided for in Section 4.2(b) above.

5. Settlement.

5.1   Subject to Section 6 hereof, promptly following the applicable Vesting Date and in any event no later than sixty (60) days following such Vesting Date, the Company will (a) issue and deliver to the Participant the number of Shares equal to the applicable number of RSUs that vested on such Vesting Date; and (b) enter the Participant's name on the books of the Company as the shareholder of record with respect to the Shares so delivered to the Participant. No fractional shares will be issued under this Agreement.

5.2   Notwithstanding Section 5.1, if the Participant is resident or employed outside of the United States, the Company, in its sole discretion, may provide for the settlement of the RSUs in the form of (i) a cash payment to the extent settlement in Shares (1) is prohibited under local law, (2) would require the Participant, the Company or an Affiliate to obtain the approval of any governmental or regulatory body in the Participant's country of residence (or country of Employment, if different), (3) would result in adverse tax consequences for the Participant, the Company or an Affiliate or (4) is administratively burdensome; or (ii) Shares, but require the Participant to sell such Shares immediately or within a specified period following the Participant's termination of Employment to comply with local law, rules and/or regulations (in which case, the Participant hereby agrees that the Company shall have the authority to issue sale instructions in relation to such Shares on the Participant's behalf).

6. Tax Liability; Withholding; Section 409A.

6.1   Regardless of any action the Company or Employer takes with respect to any or all income tax (including U.S. federal, state and local taxes and/or non-U.S. taxes), social insurance, payroll tax, payment on account or other tax–related withholding ("**Tax-Related Items**"), the Participant acknowledges that the ultimate liability for all Tax–Related Items legally due by the Participant is and remains the Participant's responsibility, and that the Company and Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the RSUs, including the grant of the RSUs, the vesting or settlement of the RSUs, the subsequent sale of any Shares acquired pursuant to the RSUs and the receipt of any dividends or dividend equivalents; and (b) do not commit to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items.

Unless otherwise determined by the Administrator, at the time of settlement, the Company and Employer will have the right to deduct from any compensation paid to the Participant pursuant to this Agreement or otherwise, the amount of any required withholding or other applicable taxes in respect of the RSUs, including upon the vesting and/or settlement of the RSUs, and to take all such other action as the Administrator deems necessary to satisfy all obligations for the payment of such withholding or other applicable taxes. The Company also may satisfy any withholding obligation by withholding Shares from the Shares otherwise deliverable to the Participant as a result of the vesting and settlement of the RSUs (or, in the

case of RSUs settled in cash, a portion of the cash proceeds); *provided, however*, that no Shares will be withheld with a value exceeding the minimum amount of tax required to be withheld by law (as determined by the Administrator in good faith and in its sole discretion). Furthermore, the Company may, on behalf of the Participant, sell a sufficient number of whole Shares issued upon settlement of the RSUs having an aggregate value that would satisfy any withholding obligation (in which case, the Participant hereby agrees that the Company has the authority to issue sale instructions on the Participant's behalf).

In the event the withholding requirements are not satisfied through the methods described herein, no Shares (or cash) will be issued in settlement of the RSUs unless and until satisfactory arrangements (as determined by the Administrator) have been made by the Participant with respect to the payment of any Tax–Related Items. If the Participant is subject to taxation in more than one jurisdiction, the Participant acknowledges that the Company, the Employer or another Affiliate may be required to withhold or account for Tax-Related Items in more than one jurisdiction. By accepting this grant of RSUs, the Participant expressly consents to the withholding methods as provided for hereunder. All other Tax-Related Items related to the RSUs and any Shares or cash delivered in payment thereof are the Participant's sole responsibility.

6.2    This Agreement is intended to comply with Section 409A or an exemption thereunder, and will be construed and interpreted in a manner that is consistent with the requirements for avoiding additional taxes or penalties under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event will the Company or any Affiliate be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Participant on account of non-compliance with Section 409A.

6.3    If the Participant is determined to be a "specified employee" within the meaning of Section 409A, and the U.S. Treasury regulations thereunder, as determined by the Administrator, at the time of the Participant's "separation from service" within the meaning of Section 409A and the U.S. Treasury regulations thereunder, then to the extent necessary to prevent any accelerated or additional tax under Section 409A, the settlement and delivery of any Shares hereunder upon such separation from service will be delayed until the earlier of (a) the date that is six months and one day following the Participant's separation from service and (b) the Participant's death. For purposes of this Agreement, all references to "termination of Employment" and correlative phrases will be construed to require a "separation from service" (as defined in Section 1.409A-1(h) of the U.S. Treasury regulations after giving effect to the presumptions contained therein).

7.    Compliance with Law; Repatriation.

7.1    The Award granted hereunder and the issuance and transfer of the Shares is contingent upon and subject to compliance by the Company and the Participant with all applicable requirements of federal, state and non-U.S. securities laws and with all applicable requirements of any stock exchange on which the Stock may be listed. In the event such requirements are not met, the Award may be declared null and void and the Participant will not have any claims

against the Company or any Affiliate to receive any payment or other benefits in lieu of the Award. Further, no Shares will be issued or transferred unless and until any then applicable requirements of federal, state and non-U.S. laws and regulatory agencies have been fully complied with to the satisfaction of the Company and its counsel.

7.2    As a condition of this Award, the Participant agrees to repatriate all payments attributable to the RSUs in accordance with local foreign exchange rules and regulations in the Participant's country of residence (and country of Employment, if different). In addition, the Participant agrees to take any and all actions, and <u>consents</u> to any and all actions taken by the Company and Employer, as may be required to allow the Company and Employer to comply with local laws, rules and regulations in the Participant's country of residence <u>(and country of Employment, if different)</u>. Finally, the Participant agrees to take any and all actions that may be required to comply with the Participant's personal legal and tax obligations under local laws, rules and regulations in the Participant's country of residence <u>(and country of Employment, if different)</u>.

8.    <u>Consent to Collection/Processing/Transfer of Personal Data</u>. Pursuant to applicable personal data protection laws, the Company hereby notifies the Participant of the following in relation to the Participant's personal data and the collection, use, processing and transfer of such data in relation to the Company's grant of the RSUs and participation of the Participant in the Plan. The collection, use, processing and transfer of the Participant's personal data is necessary for the Company's administration of the Plan and the Participant's participation in the Plan, and the Participant's denial and/or objection to the collection, use, processing and transfer of personal data may affect the Participant's participation in the Plan. As such, the Participant voluntarily acknowledges and consents (where required under applicable law) to the collection, use, processing and transfer of personal data as described herein.

The Company and its Affiliates hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any Shares or directorships held in the Company, details of all options, units or any other entitlement to Shares (or cash) awarded, cancelled, purchased, vested, unvested or outstanding in the Participant's favor, for the purpose of managing and administering the Plan ("**Data**"). The Data may be provided by the Participant or collected, where lawful, from third parties, and the Company and its Affiliates will process the Data for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan. The Data processing will take place through electronic and non-electronic means according to logics and procedures strictly correlated to the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations in the Participant's country of residence (and country of Employment, if different). Data processing operations will be performed minimizing the use of personal and identification data when such operations are unnecessary for the processing purposes sought. Data will be accessible within the Company's organization only by those persons requiring access for purposes of the implementation, administration and operation of the Plan and for the Participant's participation in the Plan.

The Company and its Affiliates will transfer Data internally as necessary for the purpose

of implementation, administration and management of the Participant's participation in the Plan, and the Company and its Affiliates may further transfer Data to any third parties assisting the Company in the implementation, administration and management of the Plan. These recipients may be located in the European Economic Area, or elsewhere throughout the world, such as the United States. The Participant hereby authorizes (where required under applicable law) them to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing his or her participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of Shares (or cash) on the Participant's behalf to a broker, escrow agent or other third party with whom the Participant may elect to deposit any Shares (or cash) acquired pursuant to the Plan.

The Participant may, at any time, exercise his or her rights provided under applicable personal data protection laws, which may include the right to (a) obtain confirmation as to the existence of the Data, (b) verify the content, origin and accuracy of the Data, (c) request the integration, update, amendment, deletion, or blockage (for breach of applicable laws) of the Data, (d) oppose, for legal reasons, the collection, processing or transfer of the Data which is not necessary or required for the implementation, administration and/or operation of the Plan and the Participant's participation in the Plan, and (e) withdraw the Participant's consent to the collection, processing or transfer of Data as provided hereunder (in which case, the Award will be null and void). The Participant may seek to exercise these rights by contacting the Participant's local Human Resources manager or the Company's Human Resources Department.

9. <u>Electronic Delivery</u>. The Company may, in its sole discretion, deliver by electronic means any documents related to current or future participation in the Plan. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

10. <u>Non-competition and Non-solicitation</u>.

10.1 In consideration of the Award, the Participant agrees and covenants not to, without the explicit written permission of the Company's General Counsel:

(a)    work for, be employed or engaged by, or in any manner contribute his or her knowledge or services to, directly or indirectly, in whole or in part, as an employee, officer, owner, manager, advisor, consultant, agent, partner, director, shareholder, volunteer, intern or in any other similar capacity any entity engaged in the same or similar business as the Company and its Affiliates during the Participant's Employment and for a period of twelve (12) months following the termination of the Participant's Employment (howsoever caused);

(b)    directly or indirectly, solicit, hire, recruit, attempt to solicit, hire or recruit, or otherwise induce the termination of Employment of any employee of the Company or its Affiliates or assist any other person or entity to do any of the foregoing, during the Participant's Employment and for a period of twelve (12) months following the termination of the

Participant's Employment (howsoever caused); or

(c)   directly or indirectly, solicit, contact (including, but not limited to, by e-mail, regular mail, express mail, telephone, fax, or instant message), attempt to contact or meet with any of the then current customers of the Company or any of its Affiliates for purposes of offering, accepting or delivering any goods or services similar to or competitive with those currently offered by the Company or any of its Affiliates, or known by the Participant to be in development by the Company or any of its Affiliates, during the Participant's Employment and for a period of twelve (12) months following the termination of the Participant's Employment (howsoever caused).

10.2  In the event of a breach of any of the covenants contained in Section 10.1:

(a)   any unvested portion of the RSUs will be forfeited effective as of the date of such breach, unless sooner terminated by operation of another term or condition of this Agreement or the Plan; and

(b)   the Participant hereby consents and agrees that the Company will be entitled to a temporary restraining order and preliminary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security, and to an award of its reasonable attorney's fees incurred in securing such relief. The aforementioned equitable relief will be in addition to, and not in lieu of, any legal remedies, monetary damages or other available forms of relief.

10.3  Provisions of this Agreement will survive any termination of this Agreement or the settlement of the RSUs if so provided herein or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, the obligations of the Participant under this Section 10 and the provisions of Section 11 below.

11. Recovery of Compensation. The RSUs, any Shares (or cash) delivered hereunder and any gains realized or other amounts in respect of such RSUs will be subject to recoupment by the Company to the extent required to comply with applicable laws, rules or regulations, the rules of the stock exchange on which the Shares are traded and/or any Company clawback policy, as may be in effect and amended, from time to time. By accepting the Award, the Participant agrees and consents to the Company's application, implementation and enforcement of (a) any such clawback policy, and (b) any provision of applicable law relating to cancellation, recoupment, rescission or payback of compensation and expressly agrees that the Company may take such actions as are necessary to effectuate the clawback policy (as applicable to the Participant) or applicable law without further consent or action being required by the Participant. For purposes of the foregoing, the Participant expressly and explicitly authorizes the Company to issue instructions, on the Participant's behalf, to any brokerage firm and/or third party administrator engaged by the Company to hold the Participant's Shares and other amounts acquired under the Plan to re-convey, transfer or otherwise return such Shares and/or other amounts to the Company. To the extent that the terms of this Agreement and any

applicable clawback policy conflict, the terms of such clawback policy shall prevail.

12. Notices. Any notice required to be delivered to the Company under this Agreement will be in writing and addressed to the Secretary of the Company at the Company's principal corporate offices. Any notice required to be delivered to the Participant under this Agreement will be in writing and addressed to the Participant at the Participant's address as shown in the records of the Company. Either party may designate another address in writing (or by such other method approved by the Company) from time to time.

13. Governing Law. This Agreement will be construed and interpreted in accordance with the laws of the State of Delaware without regard to conflict of law principles.

14. Interpretation. Any dispute regarding the interpretation of this Agreement will be submitted by the Participant or the Company to the Administrator for review. The resolution of such dispute by the Administrator will be final and binding on the Participant and the Company.

15. Successors and Assigns. The Company may assign any of its rights under this Agreement. This Agreement will be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein, this Agreement will be binding upon the Participant and the Participant's beneficiaries, executors or administrators.

16. Severability. The invalidity or unenforceability of any provision of the Plan or this Agreement will not affect the validity or enforceability of any other provision of the Plan or this Agreement, and each provision of the Plan and this Agreement will be severable and enforceable to the extent permitted by law.

17. Nature of the Award. By entering into this Agreement and accepting the Award, the Participant acknowledges that:

     (a) the Plan is established voluntarily by the Company, is discretionary in nature and may be modified, suspended or terminated by the Company, in its sole discretion, at any time as provided in the Plan;

     (b) the grant of this Award is a discretionary one-time benefit and does not create any contractual or other right to receive future grants of awards or benefits in lieu of awards;

     (c) all determinations with respect to any such future grants, including, but not limited to, the times when awards will be granted, the form of awards, the number of shares subject to each award, the award price, if any, and the time or times when each award will be settled, will be at the sole discretion of the Company;

     (d) the Participant's participation in the Plan is voluntary;

     (e) the value of this Award is an extraordinary item which is outside the scope of the Participant's employment contract, if any;

     (f) this Award is not part of normal or expected compensation for any purpose, including without limitation for calculating any benefits, severance, resignation, termination,

redundancy, end of service payments, bonuses, long-service awards, welfare, insurance, pension or retirement benefits or similar payments;

(g) the future value of the Shares subject to this Award is unknown and cannot be predicted with certainty;

(h) neither the Company nor any Affiliate shall be liable for any foreign exchange rate fluctuation, where applicable, between the Participant's local currency and the United States dollar that may affect the value of the RSUs or of any amounts due to the Participant pursuant to the settlement of the RSUs or the subsequent sale of any Shares acquired upon settlement;

(i) neither the Plan, this Award nor the issuance of the Shares will (1) confer upon the Participant any right to continue in the employ of (or any other relationship with) the Employer, (2) alter in any way the Participant's current Employment relationship with the Employer, or (3) limit in any respect the right of the Employer to terminate the Participant's Employment or other relationship with the Employer, at any time;

(j) in the event that the Participant is not a direct employee of the Company, the grant of this Award will not be interpreted to form an Employment relationship with the Company; and furthermore, the grant of this Award will not be interpreted to form an employment contract with the Employer, the Company or any Affiliate. For the avoidance of doubt, language relating to termination for "Cause" or "not-for-Cause" pertains solely to the opportunity to be granted RSUs and vest in the RSUs as provided in this Agreement, and does not require the Company or Employer to establish "Cause" for the termination of the Participant's Employment;

(k) in consideration of the Award, no claim or entitlement to compensation or damages shall arise from termination of the RSUs or diminution in value of the RSUs or Shares acquired upon vesting of the RSUs resulting from termination of the Participant's Employment or service (for any reason whatsoever and whether or not in breach of local labor laws) and the Participant irrevocably releases the Company and any Affiliate from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing this Agreement, the Participant shall be deemed irrevocably to have waived his or her entitlement to pursue such claim;

(l) in the event of termination of the Participant's Employment or service (whether or not in breach of local labor laws), the Participant's right to receive the RSUs and vest in the RSUs under the Plan, if any, will terminate effective as of the date that the Participant is no longer actively employed or providing service and will not be extended by any notice period mandated under local law (e.g., active Employment or service would not include a period of "garden leave" or similar period pursuant to local law); the Administrator shall have the exclusive discretion to determine when the Participant is no longer actively employed or providing service for purposes of the RSUs;

(m) neither the Company nor the Employer is providing any tax, legal or financial advice, nor is the Company or Employer making any recommendations regarding the

Participant's participation in the Plan, or the Participant's acquisition or sale of the underlying Shares; and

(n)   the Participant is hereby advised to consult with the Participant's personal tax, legal and financial advisors regarding participation in the Plan before taking any action related to the Plan or the RSUs.

18. Amendment.  The Administrator has the right to amend, alter, suspend, discontinue or cancel the RSUs, prospectively or retroactively; *provided, that*, no such amendment will adversely affect the Participant's material rights under this Agreement without the Participant's consent.

19. Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. Counterpart signature pages to this Agreement transmitted by facsimile transmission, by electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

20. Private Placement.  If the Participant is resident and/or employed outside of the United States, the Award is not intended to be a public offering of securities in the Participant's country of residence (and country of Employment, if different).  The Company has not submitted any registration statement, prospectus or other filing with the local securities authorities (unless otherwise required under local law), and the Award is not subject to the supervision of the local securities authorities.

21. Insider Trading/Market Abuse Laws.  The Participant's country of residence may have insider trading and/or market abuse laws that may affect the Participant's ability to acquire or sell Shares under the Plan during such times the Participant are considered to have "inside information" (as defined in the laws in the Participant's country).  These laws may be the same or different from any Company insider trading policy. The Participant acknowledges that it is the Participant's responsibility to be informed of and compliant with such regulations, and the Participant is advised to speak to his / her personal advisor on this matter.

22. English Language.  If the Participant is resident and/or employed outside of the United States, the Participant acknowledges and agrees that it is the Participant's express intent that this Agreement, the Plan and all other documents, notices and legal proceedings entered into, given or instituted pursuant to the Award, be drawn up in English.  If the Participant has received this Agreement, the Plan or any other documents related to the Award translated into a language other than English, and if the meaning of the translated version is different from the English version, the meaning of the English version shall control.

23. Addendum.  Notwithstanding any provisions of this Agreement to the contrary, the Award shall be subject to any special terms and conditions for the Participant's country of residence (and country of Employment, if different), as set forth in the applicable Addendum to this Agreement.  Further, if the Participant transfers residence and/or Employment to another country reflected in an Addendum to this Agreement, the special terms and conditions for such

country will apply to the Participant to the extent the Administrator determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local laws, rules and/or regulations or to facilitate the operation and administration of the Award and the Plan (or the Administrator may establish alternative terms and conditions as may be necessary or advisable to accommodate the Participant's transfer). Any applicable Addendum shall constitute part of this Agreement.

24. Additional Requirements. The Administrator reserves the right to impose other requirements on the Award, any payment made pursuant to the Award, and the Participant's participation in the Plan, to the extent the Administrator determines, in its sole discretion, that such other requirements are necessary or advisable in order to comply with local laws, rules and/or regulations or to facilitate the operation and administration of the Award and the Plan. Such requirements may include (but are not limited to) requiring the Participant to sign any agreements or undertakings that may be necessary to accomplish the foregoing.

25. Acceptance. The Participant hereby acknowledges receipt of a copy of the Plan and this Agreement. The Participant has read and understands the terms and provisions thereof, and accepts the Award subject to all of the terms and conditions of the Plan and this Agreement.

*[Remainder of page intentionally left blank]*

PARTICIPANT

By: SIGNED BY ELECTRONIC SIGNATURE
    DiFabio, Ronald M

THE PARTICIPANT MUST ELECTRONICALLY ACCEPT THIS AWARD WITHIN NINETY (90) DAYS AFTER THE GRANT DATE. IF THE AWARD IS NOT ACCEPTED BY THE NINETIETH (90TH) DAY AFTER THE GRANT DATE, IT WILL BE DEEMED REJECTED AND THE AWARD WILL BE NULL AND VOID.

BY ELECTRONICALLY ACCEPTING THE AWARD, THE PARTICIPANT AGREES THAT (i) SUCH ACCEPTANCE CONSTITUTES THE PARTICIPANT'S ELECTRONIC SIGNATURE IN EXECUTION OF THIS AGREEMENT; (ii) THE PARTICIPANT AGREES TO BE BOUND BY THE PROVISIONS OF THE PLAN, THE AGREEMENT AND THE ADDENDUM; (iii) THE PARTICIPANT HAS REVIEWED THE PLAN, THE AGREEMENT AND THE ADDENDUM IN THEIR ENTIRETY, HAS HAD AN OPPORTUNITY TO OBTAIN THE ADVICE OF COUNSEL PRIOR TO ACCEPTING THE AWARD AND FULLY UNDERSTANDS ALL OF THE PROVISIONS OF THE PLAN, THE AGREEMENT AND THE ADDENDUM; (iv) THE PARTICIPANT HAS BEEN PROVIDED WITH A COPY OR ELECTRONIC ACCESS TO A COPY OF THE U.S. PROSPECTUS FOR THE PLAN AND THE TAX SUPPLEMENT

TO THE U.S. PROSPECTUS FOR THE PARTICIPANT'S COUNTRY, IF APPLICABLE; AND (v) THE PARTICIPANT HEREBY AGREES TO ACCEPT AS BINDING, CONCLUSIVE AND FINAL ALL DECISIONS OR INTERPRETATIONS OF THE ADMINISTRATOR UPON ANY QUESTIONS ARISING UNDER THE PLAN, THE AGREEMENT AND THE ADDENDUM.

* * * * *

## ADDENDUM TO
## RSU AWARD AGREEMENT

The Award is subject to the following additional terms and conditions as set forth in this addendum to the Agreement (the "**Addendum**") to the extent the Participant resides and/or is employed in one of the countries addressed herein. To the extent the Participant transfers residence and/or Employment to another country, the special terms and conditions for such country as reflected in this Addendum (if any) will apply to the Participant to the extent the Administrator determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local laws, rules and/or regulations, or to facilitate the operation and administration of the Award and the Plan (or the Administrator may establish alternative terms and conditions as may be necessary or advisable to accommodate the Participant's transfer). All defined terms as contained in this Addendum shall have the same meaning as set forth in the Plan and the Agreement.

## AUSTRALIA

1.    Shareholder Approval Requirement. Notwithstanding provision in the Agreement to the contrary, the Participant will not be entitled to, and shall not claim any benefit under the Plan (including, without limitation, a legal right as set forth in Section 4 of the Agreement) if the provision of such benefit would give rise to a breach of Part 2D.2 of the Corporations Act 2001 (Cth), any other provision of that Act, or any other applicable statute, rule or regulation which limits or restricts the giving of such benefits. Further, the Company's Affiliate in Australia is under no obligation to seek or obtain the approval of its shareholders for the purpose of overcoming any such limitation or restriction.

## CANADA

1.    Settlement in Shares. Notwithstanding anything to the contrary in the Agreement or the Plan, the Award shall be settled only in Shares (and may not be settled in the form of a cash payment).

2.    Effective Date of Termination. Notwithstanding any language to the contrary set forth in the Agreement, for purposes of vesting under the RSUs, the Participant's Employment will be considered terminated the date that the Participant is no longer actively providing services (unless the Participant is on a leave of absence approved by the Company), regardless of any notice period or period of pay in lieu of such notice required under applicable statutory law, regulatory law and/or common law; the Administrator shall have the exclusive discretion to determine when the Participant is no longer actively providing services for purposes of the RSU.

3.    Use of English Language. If the Participant is a resident of Quebec, by accepting the RSUs, the Participant acknowledges and agrees that it is the Participant's wish that the Agreement, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to the RSUs, either directly or indirectly, be drawn up in English.

**Utilisation de l'anglais.** Si le Participant est un résident du Québec, en acceptant les Droits sur des Actions Assujettis à des Restrictions, le Participant reconnaît et accepte avoir requis que le Contrat, la présente Annexe, ainsi que tous autres documents, avis et procédures judiciaires, exécutés, donnés ou intentés en vertu des, ou liés directement ou indirectement aux, présents Droits sur des Actions Assujettis à des Restrictions soient rédigés en anglais.

## MEXICO

1. <u>Commercial Relationship</u>. The Participant expressly recognizes that his / her participation in the Plan and the Company's grant of RSUs does not constitute an employment relationship between the Participant and the Company. The Participant has been granted the RSUs as a consequence of the commercial relationship between the Company and the Employer in Mexico, and the Employer in Mexico is the Participant's sole employer. Based on the foregoing, (a) the Participant expressly recognizes the Plan and the benefits the Participant may derive from his / her participation in the Plan does not establish any rights between the Participant and the Employer in Mexico that employs the Participant, (b) the Plan and the benefits the Participant may derive from his / her participation in the Plan are not part of the employment conditions and/or benefits provided by the Employer in Mexico, and (c) any modifications or amendments of the Plan by the Company, or a termination of the Plan by the Company, shall not constitute a change or impairment of the terms and conditions of the Participant's employment with the Employer in Mexico.

2. <u>Extraordinary Item of Compensation</u>. The Participant expressly recognizes and acknowledges that his / her participation in the Plan is a result of the discretionary and unilateral decision of the Company, as well as the Participant's free and voluntary decision to participate in the Plan in accordance with the terms and conditions of the Plan, the Agreement and this Addendum. As such, the Participant acknowledges and agrees that the Company may, in its sole discretion, amend and/or discontinue the Participant's participation in the Plan at any time and without any liability. The value of this Award is an extraordinary item of compensation outside the scope of the Participant's employment contract, if any. This Award is not part of the Participant's regular or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits, or any similar payments, which are the exclusive obligations of the Employer in Mexico.

## SINGAPORE

1. <u>Securities Law Information</u>. The grant of the RSUs under the Plan is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) (the "**SFA**"). The Plan has not been and will not be lodged or registered as a prospectus with the Monetary Authority of Singapore and is not regulated by any financial supervisory authority pursuant to any legislation in Singapore. Accordingly, statutory liability under the SFA in relation to the content of prospectuses would

not apply. The Participant should note that, as a result, the RSUs are subject to section 257 of the SFA and the Participant will not be able to make: (a) any subsequent sale of the Shares underlying the RSUs in Singapore; or (b) any offer of such subsequent sale of the Shares subject to the RSUs in Singapore, unless such sale or offer is made pursuant to the exemptions under Part XIII Division 1 Subdivision (4) (other than section 280) of the SFA.

## SOUTH KOREA

1.     <u>Consent to Collection/Processing/Transfer of Personal Data</u>.  The following provision shall replace Section 8 of the Agreement in its entirety:

Pursuant to applicable personal data protection laws, the Company hereby notifies the Participant of the following in relation to the Participant's personal data and the collection, processing and transfer of such data in relation to the Company's grant of RSUs and the Participant's participation in the Plan.  The collection, processing and transfer of the Participant's personal data is necessary for the Company's administration of the Plan and the Participant's participation in the Plan, and although the Participant has the right to deny or object to the collection, processing and transfer of personal data, the Participant's denial and/or objection to the collection, processing and transfer of personal data may affect the Participant's participation in the Plan.  As such, the Participant voluntarily acknowledges and consents (where required under applicable law) to the collection, use, processing and transfer of personal data as described herein. The Company shall retain and use the Participant's personal data until the purpose of the collection and use of the Participant's personal data is accomplished and shall promptly destroy the Participant's personal data thereafter.

The Company and its Affiliates hold certain personal information about the Participant, including the Participant's name, home address and telephone number, date of birth, social security number (resident registration number) or other employee identification number, salary, nationality, job title, any Shares or directorships held in the Company, details of all options, units or any other entitlement to Shares (or cash) awarded, cancelled, purchased, vested, unvested or outstanding in the Participant's favor, for the purpose of managing and administering the Plan ("**Data**").  The Data may be provided by the Participant or collected, where lawful, from third parties, and the Company will process the Data for the exclusive purpose of implementing, administering and managing the Participant's participation in the Plan. The Data processing will take place through electronic and non-electronic means according to logics and procedures strictly correlated to the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations in the Participant's country of residence (and country of Employment, if different).  Data processing operations will be performed minimizing the use of personal and identification data when such operations are unnecessary for the processing purposes sought. Data will be accessible within the Company's organization only by those persons requiring access for purposes of the implementation, administration and operation of the Plan and for the Participant's participation in the Plan.

The Company and its Affiliates will transfer Data internally as necessary for the purpose of implementation, administration and management of the Participant's participation in the Plan, and the Company and its Affiliates may further transfer Data to any third parties assisting the Company in the implementation, administration and management of the Plan. The third party recipients of Data may be any affiliates of the Company and / or Merrill Lynch or any successor or any other third party that the Company or Merrill Lynch (or its successor) may engage to assist with the implementation, administration and management of the Plan from time to time. These recipients may be located in the European Economic Area, or elsewhere throughout the world, such as the United States. The Participant hereby authorizes (where required under applicable law) them to receive, possess, use, retain and transfer the Data, in electronic or other form, for purposes of implementing, administering and managing the Participant's participation in the Plan, including any requisite transfer of such Data as may be required for the administration of the Plan and/or the subsequent holding of Shares (or cash) on the Participant's behalf to a broker, escrow agent or other third party with whom the Participant may elect to deposit any Shares acquired pursuant to the Plan. Such third parties to which the Company will transfer the Participant's personal data shall retain and use the Participant's personal data until the purpose of the collection and use of the Participant's personal data is accomplished and shall promptly destroy the Participant's personal data thereafter.

The Company and any third party recipient of the Data will use, process and store the Data only to the extent they are necessary for the purposes described above.

The Participant may, at any time, exercise the Participant's rights provided under applicable personal data protection laws, which may include the right to (a) obtain confirmation as to the existence of the Data, (b) verify the content, origin and accuracy of the Data, (c) request the integration, update, amendment, deletion, or blockage (for breach of applicable laws) of the Data, (d) to oppose, for legal reasons, the collection, processing or transfer of the Data which is not necessary or required for the implementation, administration and/or operation of the Plan and the Participant's participation in the Plan, and (e) withdraw the Participant's consent to the collection, processing or transfer of Data as provided hereunder (in which case, the RSUs will be null and void). The Participant may seek to exercise these rights by contacting the Participant's local Human Resources manager or the Company's Human Resources department.

BY ELECTRONICALLY ACCEPTING THIS AGREEMENT:

1) THE PARTICIPANT AGREES TO THE COLLECTION AND USE OF THE PARTICIPANT'S PERSONAL DATA.

2) THE PARTICIPANT AGREES TO THE PROVISION OF THE PARTICIPANT'S PERSONAL DATA TO A THIRD PARTY AND TRANSFER OF HIS / HER PERSONAL DATA OVERSEAS.

3)  THE PARTICIPANT AGREES TO THE PROCESSING OF THE PARTICIPANT'S UNIQUE IDENTIFYING INFORMATION (RESIDENT REGISTRATION NUMBER).

## UNITED KINGDOM

1.  <u>Tax Liability; Withholding; Section 409</u>.  The following provision supplements Section 6 of the Agreement:

> If payment or withholding of the income tax due in connection with the RSUs is not made within ninety (90) days after the end of the UK tax year in which the event giving rise to the income tax liability occurs or such other period specified in section 222(1)(c) of the U.K. Income Tax (Earnings and Pensions) Act 2003 (the "**Due Date**"), the amount of any uncollected income tax shall constitute a loan owed by the Participant to the Employer, effective as of the Due Date. The Participant agrees that the loan will bear interest at the then-current official rate of Her Majesty's Revenue & Customs ("**HMRC**"), it shall be immediately due and repayable, and the Company or the Employer may recover it at any time thereafter by any of the means referred to in Section 7 of the Agreement.  Notwithstanding the foregoing, if the Participant is a director or executive officer of the Company (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), the Participant will not be eligible for a loan from the Company or Employer to cover the income tax liability.  In the event that the Participant is a director or executive officer and the income tax is not collected from or paid by the Participant by the Due Date, the amount of any uncollected income tax will constitute a benefit to the Participant on which additional income tax and national insurance contributions ("**NICs**") will be payable. The Participant will be responsible for reporting any income tax and for reimbursing the Company or Employer the value of any employee NICs due on this additional benefit.

2.  <u>Exclusion of Claim</u>. The Participant acknowledges and agrees that the Participant will have no entitlement to compensation or damages insofar as such entitlement arises or may arise from the Participant's ceasing to have rights under or to be entitled to the RSUs, whether or not as a result of the Participant's termination of Employment (whether the termination is in breach of contract or otherwise), or from the loss or diminution in value of the RSUs.  Upon the grant of the RSUs, the Participant will be deemed irrevocably to have waived any such entitlement.

*     *     *     *     *

6636316-v3\GESDMS

Accepted on 01/08/2016