UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEURIG GREEN MOUNTAIN, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>SHARKNINJA OPERATING LLC,<br>RONALD DIFABIO, and<br>STEPHEN TURNER,<br><br>      Defendants. | Civil Action No. 17-12133 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

Plaintiff Keurig Green Mountain, Inc. ("Keurig") hereby submits this Memorandum of Law In Support of Its Motion for a Preliminary Injunction. Defendants Ronald DiFabio ("DiFabio") and Stephen Turner ("Turner") are former Keurig employees who resigned from Keurig and accepted employment with Keurig's direct competitor, Defendant SharkNinja Operating LLC ("SharkNinja"). Keurig has discovered that both DiFabio and Turner took confidential, proprietary and competitive business information of Keurig. Some of this information has been migrated onto SharkNinja's internal electronic systems. Keurig thus seeks the immediate return of any and all of its confidential and/or proprietary information in Defendants' possession, custody or control.

## <u>INTRODUCTION</u>

Keurig seeks to obtain injunctive relief against: (1) DiFabio, a former Senior Vice President in Keurig's sales organization; (2) Turner, a former Strategic Account Manager at Keurig; and (3) SharkNinja (collectively, "Defendants"), Keurig's competitor in the personal

beverage (coffee) industry, and DiFabio's and Turner's new employer. In conjunction with their resignations from Keurig, DiFabio and Turner misappropriated confidential and proprietary information from Keurig in direct violation of their statutory and common law duties owed to Keurig, and in violation of their Confidentiality Agreements with Keurig, attached as Exhibits A and E, respectively, to the Keurig's Verified Complaint ("Confidentiality Agreements").

Without immediate injunctive relief from this Court, Keurig will suffer irreparable harm from, *inter alia*, the Defendants' continuing tortious acts and unfair competition in violation of their contractual, statutory and common law duties.

## FACTUAL BACKGROUND

A complete recitation of the factual background is contained in the Verified Complaint, which is incorporated herein by reference.

## STANDARD FOR PRELIMINARY INJUNCTION

Courts in the First Circuit weigh four factors in determining whether to grant a preliminary injunction: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of the harms (*i.e.* hardship to the movant if the injunction is not granted versus the hardship to the non-movant if the injunction is granted); and (4) any effect on the public interest in granting or not granting the injunction. Unum Corp. v. Loftus, 220 F. Supp. 3d 143, 147-148 (D. Mass. 2016), citing Charlesbank Equity Fund II, Ltd. Partnership v. Blinds to Go, Inc., 370 F. 3d 151, 158 (1st Cir. 2004). The first factor, the likelihood of success on the merits, is the most important. New Comm Wireless Services, Inc., v. SprintCom, Inc., 287 F. 3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits[.]"); Covidien LP v. Esch, 229 F. Supp. 3d 94, 98 (D. Mass. 2017). First Circuit courts also "measure irreparable harm on a sliding scale,

working in conjunction with a moving party's likelihood of success on the merits . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc., v. Citigroup Mkts. Inc., 622 F. 3d 36, 42-43 (1st Cir. 2010) (internal quotations and citations omitted).

## ARGUMENT

I.  **Keurig Has A Likelihood of Success on the Merits of its Breach of Contract Claims against DiFabio and Turner, on its Claims of Violations of the Federal Defend Trade Secrets Act and the Computer Fraud and Abuse Act, and on its Claims of Violations of the Massachusetts Misappropriation of Trade Secrets Act.**

Under the above-referenced standard, Keurig is entitled to injunctive relief to enforce the Confidentiality Agreements executed by DiFabio and Turner by requiring the immediate return of its confidential business and trade secrets information. The Verified Complaint has set forth sufficient facts to show Keurig's strong likelihood of success on: Count I (Breach of Contract – DiFabio); Count III (Breach of Contract – Turner); Count VIII (Violation of the Defend Trade Secrets Act – DiFabio and Turner); Count IX (Violation of the Computer Fraud and Abuse Act – DiFabio and Turner); and Count X (Misappropriation of Trade Secrets under Mass. Gen. L. ch. 93, §42, et seq. – all Defendants).[1]

A.  **DiFabio and Turner Clearly Breached the Keurig Confidentiality Agreement By Taking and Failing to Return Keurig's Confidential Information.**

As more fully set forth in the Verified Complaint, DiFabio executed a Confidentiality Agreement when he started employment with Keurig in which he promised that he would not, at any time, "directly or indirectly, use any Confidential Information (as hereinafter defined), other than pursuant to my employment [with Keurig], or disclose to anyone outside of [Keurig] any such Confidential Information." Verified Complaint, ¶ 22. DiFabio further agreed that if he

---

[1] Although Keurig has asserted multiple claims, this Court need only find it is likely to succeed on one of its claims to issue injunctive relief. See Unum, 220 F. Supp. 3d at 148; SimpliVity Corp. v. Bondranko, 204 F. Supp. 3d 340, 348 (D. Mass. 2016).

ceased to be employed by Keurig at any time, he would immediately return any property belonging to Keurig. Id., Ex. A., ¶¶ 2, 8. When Turner commenced employment with Keurig, he also agreed to identical provisions in his Confidentiality Agreement. Id., Ex. E., ¶¶ 2, 8.

The term "Confidential Information" is defined in both Confidentiality Agreements as including, *inter alia*:

> "[A]ll trade secrets, proprietary information and other data and information (and any tangible evidence, record or representation thereof) . . . which is in possession of [Keurig] (whether or not the property of [Keurig], which in any way relates to the present or future business of [Keurig], which is maintained in confidence by [Keurig], or which might permit [Keurig] or its customers to obtain a competitive advantage over competitors who do not have access to such trade secrets, proprietary information, or other data or information."

Verified Complaint, Exs. A, E, ¶ 2.

The Confidentiality Agreements executed by DiFabio and Turner further state that Confidential Information includes, *inter alia*, the following:

> "[T]he name of any customer, vendor, consultant, employee, prospective customer or consultant, any sales plan, marketing material, plan or survey, business plan or opportunity, or product or development plan or specification, business proposal, financial record, or business record or other record or information relating to the present or proposed business of [Keurig.]"

Id.

As delineated in Keurig's Verified Complaint, after DiFabio left his employment with Keurig to join SharkNinja, he violated his obligations to Keurig under his Confidentiality Agreement by asking Keurig employees to email him Keurig internal organizational charts and proprietary information about the merchandising teams at several of Keurig's retail customers. Verified Complaint, ¶ 43. This data is Confidential Information of Keurig, as defined by DiFabio's Confidentiality Agreement, and is competitive, sensitive information that DiFabio

knew that he should not have requested from current Keurig employees. DiFabio has no lawful or legitimate reason to retain Keurig's Confidential Information.

Before his resignation from Keurig in late 2016, DiFabio also removed at least nine electronic files containing Keurig's confidential business information and/or trade secrets from Keurig's electronic systems. He then loaded them, or "migrated them" onto SharkNinja's electronic systems (and used them to perform his job duties at SharkNinja). Id., ¶ 44. DiFabio also took with him from Keurig hard copies of Keurig documents which he failed to return to Keurig upon his separation from employment. Id. Despite Keurig's demands, DiFabio and SharkNinja have not turned over to Keurig its files. Id.

Turner, who resigned from Keurig in 2017 to join DiFabio at SharkNinja, followed DiFabio's lead when it came to misappropriating Keurig's Confidential Information. Turner violated his obligations to Keurig under his Confidentiality Agreement by emailing, to his personal email account, and a short time before his resignation, Keurig's Confidential Information, including highly confidential business, marketing and sales plans prepared by Keurig relating to one of Keurig's largest customers, Bed Bath & Beyond, which included a power point presentation to the customer. Id., ¶ 55. Despite Keurig's demand that Turner return any and all Keurig property, including all Confidential Information and the electronic documents he emailed to his home email address, Turner has not returned any documents whatsoever to Keurig. Id.

In these circumstances, Keurig has shown a sufficient likelihood of success on its breach of contract claims against both DiFabio and Turner. Under Massachusetts law, a plaintiff with a breach of contract claim must show that: (1) there was a valid and binding agreement between the parties; (2) the defendant breached the terms of the agreement; (3) the plaintiff's damages

were caused by the breach. See Michelson v. Digital Fin. Servs., 167 F. 3d 715, 720 (1st Cir. 1999). Here, Keurig has shown within its Verified Complaint and the exhibits attached thereto that: (1) both DiFabio and Turner agreed to valid Confidentiality Agreements that required them not to use or disclose, other than pursuant to their employment with Keurig, Keurig's Confidential Information, and to return any Keurig property to Keurig upon the separation of their employment (Verified Complaint, Exs. A, E, ¶¶ 2, 8); (2) DiFabio and Turner breached the terms of their Keurig Confidentiality Agreements by taking and not returning Keurig's property and Confidential Information (Id., ¶¶ 43-44; 55) and (3) Keurig has suffered and will suffer damages related to the loss of its information and property to a direct competitor. (Id., ¶¶ 43-44; 56-57; 62; 72). See iQuartic, Inc. v. Simms, 2015 WL 5156558, *5 (D. Mass. 2015) (Finding that an employer demonstrated a likelihood of success on its breach of contract claims against its former employee where the employee "withheld plaintiff's proprietary and confidential information despite his contractual obligations to the contrary[.]"); Boston Scientific Corp. v. Lee, 2014 WL 1946687, *5-6 (D. Mass. May 14, 2014) (finding that the plaintiff employer demonstrated a reasonably likelihood of proving that the defendant former employee breached his agreement with his employer to return the employer's proprietary information after leaving the company because he did not return the employer's documents, and further holding that whether the retention was "inadvertent" was irrelevant to the breach of contract).

    **B.    Keurig Additionally Has a Likelihood of Success on its Claims of Violation Of the Federal Defend Trade Secrets Act.**

The Defend Trade Secrets Act ("DTSA") provides a federal cause of action to the owner of a trade secret that is misappropriated and is related to a product or service used in (or intended for use in) interstate commerce. 18 U.S.C. §1836(b). The DTSA broadly defines a "trade secret" as:

6

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

>   (A) the owner thereof has taken reasonable measures to keep such information secret; and

>   (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. §1839(3).

The DTSA defines "misappropriation" as, *inter alia*, the unauthorized disclosure or use of a trade secret by a person who (1) "used improper means to acquire knowledge of the trade secret[,]" 18 U.S.C. §1839(5)(B)(i), or (2) at the time of the disclosure or use, knew or had reason to know that the trade secret was derived from or through a person who owed a duty to maintain the secrecy of the trade secret. 18 U.S.C. §1839(5)(B)(ii)(III). "Improper means" is defined to include, among other things, breach of a duty to maintain secrecy of a trade secret. 18 U.S.C. §1839(6).

As explained above and in the Verified Complaint, Keurig has taken reasonable steps to maintain the secrecy of the documents that DiFabio and Turner misappropriated, and the information in those documents derives independent economic value from not being generally known. Verified Complaint, ¶¶ 25-26. That information, moreover, relates to Keurig's products, which are sold throughout the United States and worldwide. Id. The stolen documents, therefore, constitute trade secrets under the DTSA. 18 U.S.C. §1839(3).

It is also clear that DiFabio's and Turner's actions constitute "misappropriation" under the DTSA. DiFabio misappropriated trade secrets by walking out of Keurig's door with

hardcopy and electronic documents containing trade secret information and then disclosing and using those documents in competition against Keurig. 18 U.S.C. §1839(5)(B)(i). DiFabio also misappropriated trade secrets by directing Keurig employees to email him proprietary information about Keurig's merchandising efforts *after DiFabio had resigned from Keurig*. Verified Complaint, ¶ 43. DiFabio knew that those employees had a duty to maintain the secrecy of those documents, but he still sought the information and used it to unfairly compete against Keurig. 18 U.S.C. §1839(5)(B)(ii)(III).

Turner, on the verge of resigning, emailed trade secret information to his personal email account when he had a common law and contractual duty to maintain the secrecy of that information. Moreover, Turner has refused to return those documents. Turner surely will use and/or disclose that information in his new role at SharkNinja, which amounts to misappropriation. 18 U.S.C. §1839(5)(B)(i). Under these circumstances, Keurig is likely to prevail on its DTSA claims against DiFabio and Turner. See Unum, 220 F. Supp. 3d at 146-47 (denying motion to dismiss DTSA claim where plaintiff alleged that defendant took hardcopy documents containing trade secret information from defendant former employer's office without authorization and refused to return them).

## C. Keurig Will Also Prevail on its Claims Under the Federal Computer Fraud and Abuse Act.

The Computer Fraud and Abuse Act ("CFAA") provides a private right of action where a defendant:

> knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]

18 U.S.C. §1030(a)(4); 18 U.S.C. §1030(g) (creating private cause of action).

As explained above, DiFabio removed at least nine electronic files from Keurig's computer systems and then those files somehow "migrated" onto SharkNinja's computer systems. DiFabio also instructed Keurig employees to access Keurig's computer system, collect electronic files, and then send those files to him (notwithstanding the fact that he no longer worked for Keurig). Turner, moreover, emailed several electronic files from Keurig's computer system to his personal email account shortly before he resigned. Both DiFabio and Turner breached their common law and contractual duties to Keurig when they accessed and removed those files. Verified Complaint, ¶¶ 20-26; 32; 43-44; 52-55. DiFabio also caused Keurig employees to breach their duties when he instructed them to email him files from Keurig's computer systems. In short, DiFabio and Turner acted without authorization under the CFAA when they accessed Keurig's computer systems for their illicit purposes because the resultant breaches of their contractual and common law duties terminated their authority to access those systems. Under these facts, Keurig is likely to prevail on its CFAA claims. See Guest-Tek Interactive Entm't, Inc. v. Pullen, 665 F. Supp. 2d 42, 44-46 (D. Mass. 2009) (noting that the First Circuit has advocated a broad reading of the CFAA, and denying motion to dismiss a CFAA claim where plaintiff alleged that defendant former employee copied and removed thousands of computer files, to which he had access while employed by plaintiff, before resigning to start a competing business); see also iQuartic, 2015 WL 5156558, at *4 (granting preliminary injunction and ruling that plaintiff is likely to prevail on its CFAA claim where it alleged that defendant former employee had access to plaintiff's computer systems, refused to surrender all proprietary and confidential information upon resigning, and shared details of work product during unauthorized meetings).

### D. By Taking Keurig's Confidential Information and Knowingly Retaining It, the Defendants Misappropriated Keurig's Trade Secrets in Violation of Mass. Gen. L. ch. 93, §42.

Massachusetts law prohibits the unauthorized use of trade secrets. To prevail on a claim of misappropriation of trade secrets, a plaintiff must show "the acquisition, through improper means, of a trade secret *with the intent to convert it* for use by a party other than the rightful owner." Advanced Micro Devices, Inc. v. Feldstein, 2013 WL 10944934, at *8 (D. Mass. May 15, 2013) (italics in original), citing Mass. Gen. L. ch. 93, § 42. Moreover, "[u]nder Massachusetts trade secrets law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for misappropriation of that trade secret." Data Gen. Corp. v. Grumman Sys. Support Corp., 795 F. Supp. 501, 507 (D. Mass. 1992).

> In determining what constitutes a trade secret, the court considers:
>
> (1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to its competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 239 (D. Mass. 2011), citing Jet Spray Cooler, Inc., v. Crampton, 361 Mass. 835, 840 (1972). In addition, "the mere fact that one could obtain the name and contact information of a customer via public means does not negate confidentiality." Corporate Techs., Inc., v. Harnett, 943 F. Supp. 2d 233, 240 (D. Mass. 2013), citing Oxford Global Res., Inc. v. Guerriero, 2003 WL 23112398, at *8 (D. Mass. Dec. 30, 2003).

In this case, the confidential, trade secret information that DiFabio and Turner improperly took, and that SharkNinja has improperly retained, includes detailed information concerning, *inter*

*alia*, customer contact information, electronic business information, and marketing and sales plans that were not known outside of Keurig.  Verified Complaint, ¶¶ 43, 44, 55.  This information qualifies as trade secrets under Massachusetts law.  Feldstein, 2013 WL 10944934, *8 (finding strategic licensing agreements, technical data and business strategy data were trade secrets as long as they were kept secret and noting that "such information need not provide competitors with a substantial advantage; any advantage, no matter how small . . . is sufficient[.]").

Keurig also took reasonable steps to ensure that its information remained confidential, including:  requiring employees to sign a confidentiality agreement; requiring certain employees (including DiFabio and Turner) to sign agreements containing protective covenants including provisions prohibiting certain competitive and solicitation activities during and after employment; implementing a code of conduct that requires employees to maintain the confidentiality of information that the employee learns in the scope of his or her employment; marking as confidential presentations and documents distributed to customers and business partners; requiring employees to secure their employment-related electronic devices by passwords and other methods; and requiring that employees agree to return all Keurig property, documents and materials when they leave employment with Keurig.  Verified Complaint, ¶ 25.  These are the kinds of measures that Massachusetts courts routinely find are reasonable to protect secrecy.  See, e.g., SimpliVity, 204 F. Supp. 3d at 349 (measures included requiring employees to sign confidentiality agreements, having password-protected computers, and giving employees different levels of access); Lee, 2014 WL 1946687, *4-5 (measures included stamping documents as confidential, distributing them only to a select group of individuals, and requiring employees to sign confidentiality agreements); Optos, 777 F. Supp. 2d at 240 (measures included password protections and confidentiality polices, and finding that the

employer is not required to make "heroic efforts" to show that it attempted to protect its information from misappropriation).

Finally, by knowingly retaining Keurig's trade secrets on its computer systems, and by knowingly (through DiFabio) continuing to retain Keurig's documents and trade secrets information, SharkNinja is liable to Keurig under Mass. Gen. L. ch. 93, § 42, and Keurig is entitled to injunctive relief against SharkNinja. See Data General, 795 F. Supp. at 507. See also Whipps, Inc. v. Ross Valve Mfg. Co., Inc., 2014 WL 1874754, *9 (D. Mass. 2014) (finding that the plaintiff company was likely to succeed on the merits of its trade secrets misappropriation claim and issuing a preliminary injunction).

## II. The Inevitable Misuse of the Confidential and Proprietary Keurig Business Information in Defendants' Possession Threatens Keurig with Irreparable Harm.

There is a substantial risk that Keurig's confidential, trade secret information will be inevitably used by the Defendants as they compete for customers and personnel. See, Verified Complaint, ¶¶ 1-5; 17; 33; 37; 45-46; 48. "Improper disclosure of confidential information is, in itself, an irreparable harm." Covidien, 229 F. Supp. 3d at 99 (internal citations and quotations omitted). See also Harnett, 943 F. Supp. 2d at 243 (finding that inevitable disclosure of confidential information and loss of goodwill can constitute irreparable harm, and the fact that the plaintiff's damages were difficult to quantify in dollars as of the time of the filing of the motion also constitutes irreparable harm.)

Moreover, the First Circuit uses a "sliding scale" in measuring the need for a showing of irreparable harm in the preliminary injunction context, such that "the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs, 622 F. 3d at 43 (internal quotations and citations omitted). Given the strong

likelihood of success of Keurig's claims in Counts I, III, VIII, IX and X, Keurig easily meets the "lower threshold" required to establish irreparable harm.  See iQuartic, 2015 WL 5156558, *5.

Finally, both DiFabio and Turner agreed that, should they breach the Confidentiality Agreement, money would damages would be inadequate and Keurig would therefore be entitled to injunctive relief to enforce the provisions of the Confidentiality Agreement.  Verified Complaint, Exs. A, E, p. 4.  Courts regularly enforce contractual provisions by which the parties recognize the need for injunctive relief in the event of a breach.  See, e.g., Tuckerbrook Alternative Inv., LP v. Banerjee, 2008 WL 2356349, *4 (D. Mass. June 4, 2008) ("[Movant] need not demonstrate irreparable harm as [Defendant] acknowledged in the Employment Agreement that a remedy at law would be inadequate"); HealthDrive Corp. v. Chall, 2000 WL 33967781, *5 (Mass. Super. Ct. Feb. 9, 2000) ("the parties agreed that a violation of the Agreement would constitute irreparable harm"); Borden & Remington v. Banisch, 10 Mass. L. Rptr. 696, at *5 (Mass. Super. Ct.  October 18, 1999) (same).  That term of the Confidentiality Agreement, therefore, is dispositive on the issue of irreparable harm.

### III. The Ongoing Injury that Keurig Will Suffer if Its Information is Not Returned Far Outweighs the Nonexistent Harm to the Defendants in Returning It.

Should this Court not grant the very limited preliminary injunction that Keurig seeks – simply requiring the Defendants to return and not use or further disclose Keurig's proprietary, confidential and trade secret information – Keurig faces irreparable damages.  Defendants cannot possibly suffer any harm in returning Keurig's confidential information and trade secrets that Defendants wrongfully possess.  Thus, the balance of equities clearly favors granting the injunction.  See, e.g., Covidien, 229 F. Supp. 3d at 99 (finding that the balance of the harms favored the issuance of an injunction preventing the defendant from using the plaintiff's

confidential information); Harnett, 943 F. Supp. 2d at 244-45 (finding that any harm to the defendant would not outweigh the harm of disclosure of the plaintiff's confidential information).

## IV.    The Public Interest Favors the Requested Relief.

It would be contrary to the public interest for employees such as DiFabio and Turner to be permitted to freely disregard their contractual obligations, and for companies such as SharkNinja to be permitted to unfairly gain access to the confidential business information of their competitors through the unlawful actions of their new hires.  Moreover, "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted." Shipley Co., L.L.C. v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996).  See also Covidien, 229 F. Supp. 3d at 99 ("[E]nforcing contractual provisions, including *non-disclosure* provisions which are at issue here, typically benefits the public interest.") (italics in original); iQuartic, 2015 WL 5156558, at *6 (agreeing with the former employer plaintiff that, *inter alia*, "prohibiting computer fraud and abuse, enforcing contractual obligations, [and] protecting trade secrets" are "in the public interest.")

## CONCLUSION

For the reasons stated above, this Court should grant Plaintiff's Motion and enter a Preliminary Injunction against Defendants in the form of the Proposed Order submitted by Plaintiff.

        Respectfully submitted,

        KEURIG GREEN MOUNTAIN, INC.,

        By its attorneys,

        */s/ Julie B. Brennan*_____
        Julie B. Brennan (BBO # 564101)
        Karen D. Lane (BBO #630069)
        Manchel & Brennan, P.C.
        100 River Ridge Drive, Suite 308
        Norwood, MA  02062
        (617) 796-8920
        jbrennan@manchelbrennan.com
        klane@manchelbrennan.com

Dated:  October 31, 2017

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date specified below.

Dated: October 31, 2017        /s/ Julie B. Brennan_____
                                                        Julie B. Brennan