KEURIG GREEN MOUNTAIN, INC.,

        Plaintiff,

   v.

SHARKNINJA OPERATING LLC,
RONALD DIFABIO, and
STEPHEN TURNER,

        Defendants.

Civil Action No. 17-12133-IT

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FURTHER ANSWERS TO INTERROGATORIES

Julie B. Brennan (BBO No. 564101)
Scott McConchie (BBO No. 634127)
Manchel & Brennan, P.C.
100 River Ridge Drive, Suite 308
Norwood, MA 02062
Telephone: (617) 796-8920
jbrennan@manchelbrennan.com
smcconchie@manchelbrennan.com

*Attorneys for Keurig Green Mountain, Inc.*

# Table of Contents

Introduction ...................................................................................................................... 1

Factual Background ........................................................................................................... 2

   I.    DiFabio's Post-Employment Restrictive Obligations to Keurig. ...................................... 2

   II.   SharkNinja Announces Plans to Enter the Hot Beverage Brewing
        Appliances Business. ...................................................................................................... 3

   III.  DiFabio and SharkNinja Sign Agreements with Keurig That They Will Honor DiFabio's
        Post-Employment Restrictions in Exchange for Keurig Allowing DiFabio to Work at
        Keurig, and Make Material Misrepresentations in Doing So. .......................................... 4

   IV.  DiFabio, with SharkNinja's Encouragement and Assistance, Aggressively Solicits and
        Hires Keurig Employees in an Effort to "Get the Band Back Together." ......................... 6

   V.   DiFabio and SharkNinja Immediately Disregard Their Obligations to Keurig, and
        DiFabio Actively Works in and Attends Internal and External Meetings regarding
        SharkNinja's Coffee Appliances. .................................................................................. 8

   VI.  DiFabio Misappropriates, and Distributes to 47 SharkNinja Employees, Keurig's
        Confidential and Proprietary Information. ...................................................................... 8

   VII. Turner Misappropriates Keurig's Confidential and Proprietary Information While a
        Keurig Employee and Sends It to SharkNinja During His Hiring Process with
        SharkNinja. .................................................................................................................... 9

Procedural Background ....................................................................................................... 9

Argument ............................................................................................................................ 10

   I.    SharkNinja Should Not Be Able to Unilaterally Narrow the Scope of Keurig's Requests
        to Only Two Former Keurig Employees, and Avoid Discovery Regarding the Many
        Other Keurig Employees Defendants Wrongfully Solicited and/or Hired. (Request Nos.
        1, 8, 9, 10, 17; Interrogatory No. 6) ............................................................................. 10

   II.   SharkNinja Must Produce Communications About Indemnification Agreement(s)
        Among the Defendants, or at the Very Least Include Allegedly-Privileged Documents
        on Its Privilege Log.  (Request No. 20 and Interrogatory No. 20) ................................. 15

Conclusion .......................................................................................................................... 19

Plaintiff Keurig Green Mountain, Inc. ("Keurig") hereby moves for an order compelling Defendant SharkNinja Operating LLC ("SharkNinja") to provide further responses and documents responsive to Keurig's requests for production of documents, as well as further answers to Keurig's interrogatories.

## Introduction

On October 31, 2017, Keurig filed this action as a result of SharkNinja's aggressive and improper raiding of Keurig's employees and Keurig's confidential information and trade secrets. As the Court may recall, Defendants admitted that former Keurig employee DiFabio had stolen certain Keurig documents and "migrated" them onto SharkNinja's electronic systems, and that those Keurig documents were circulated to no less than 46 SharkNinja employees. This gross misconduct by Defendants was finally uncovered only as a result of the filing of this action, multiple hearings regarding preliminary injunctive relief, and three Court Orders to Defendants compelling them to search for and return to Keurig its documents and information.

SharkNinja's misguided attempt to cover up Defendants' misconduct has continued in discovery. Although SharkNinja admittedly has hired no less than 7 Keurig employees and solicited at least 11 more, and even though such conduct is specifically alleged by Keurig in its Verified Complaint ("Complaint" or "Compl."), SharkNinja has refused to produce any documents or information regarding the soliciting or hiring of any Keurig employees, other than the two individually-named Defendants, DiFabio and Turner.

SharkNinja cannot unilaterally dictate that Keurig's claims are limited to SharkNinja's solicitation and hiring of only two former Keurig employees, or limit Keurig's claims to only the documents and information that those two former Keurig employees misappropriated and used at SharkNinja. Moreover, even with respect to DiFabio and Turner, SharkNinja refuses to produce

all of the documents and communications relating to their hiring by SharkNinja, including communications regarding indemnification agreements and agreements regarding confidential information with SharkNinja, *which SharkNinja admits exist*. In addition, and as explained below, SharkNinja has taken other aggressive (and misguided) discovery positions. Defendants' ongoing attempts to hide their unlawful conduct has forced Keurig to file this Motion to Compel.

## Factual Background

### I. DiFabio's Post-Employment Restrictive Obligations to Keurig.

Keurig is an established seller of hot beverage brewing appliances with global brand recognition. Compl. ¶ 17. In 2008, DiFabio began his career at Keurig as a Vice President of Retail Sales, ultimately rising to Senior Vice President of U.S. Sales in 2013. Compl. ¶ 18. Throughout his employment with Keurig, DiFabio served in an executive sales role, with extensive access to confidential information and trade secrets, developing and implementing confidential and competitive sales strategies, business analytics, and operations policies. Compl. ¶¶ 18-19. On behalf of Keurig, DiFabio cultivated high-level relationships with major retailers and negotiated confidential terms and conditions of Keurig's agreements with its retailers. Compl. ¶ 18. As the Senior Vice President of U.S. Sales, DiFabio led five sales teams, and over 40 Keurig employees reported to him. *Id.*

While employed with Keurig, DiFabio agreed to certain post-employment restrictive covenants in exchange for lucrative compensation. For example, upon commencing his employment, DiFabio entered into a Confidentiality Agreement with Keurig, agreeing to refrain from, among other things, during his employment and for a period of one year after his departure, participating in competing businesses and inducing Keurig employees to leave Keurig. Compl. ¶¶ 20-24. In addition, in 2015, DiFabio entered into a Restricted Stock Unit Award Agreement with Keurig in order to receive 1,866 restricted stock units of Keurig. Compl. ¶ 29. Pursuant to the

RSU Agreement, DiFabio reaffirmed and agreed to expanded post-employment restrictions. *Id.* As a result of his ownership of 1,866 restricted stock units, DiFabio received more than **$1,137,000** upon the closing of a Keurig corporate transaction in March 2016. Compl. ¶ 31. Less than one month later, effective March 27, 2016, DiFabio resigned. Compl. ¶ 32.

## II. SharkNinja Announces Plans to Enter the Hot Beverage Brewing Appliances Business.

In 2015, SharkNinja expanded into the business of manufacturing and selling coffee maker appliances that directly compete with Keurig's appliances for direct customer sales, distribution, and shelf space at retailers. Compl. ¶ 33. SharkNinja aspires to usurp Keurig as America's leading supplier of coffee brewers, a strategy SharkNinja is familiar with, having previously "eaten Dyson's lunch to become America's best-selling vacuum cleaner." Andrew Cave, *Now SharkNinja Wants to Change the Way America Brews Coffee*, Forbes (August 28, 2015), https://www.forbes.com/sites/andrewcave/2015/08/28/now-sharkninja-wants-to-change-the-way-america-brews-coffee/#261f4abe4caa. According to various industry pundits, SharkNinja now has its "sights" on Keurig. *Id.*[1] As SharkNinja's CEO explained, SharkNinja intends to "transform the coffee industry" and "change the way consumers make (and drink) their coffee" – a vision that by necessity puts Keurig in the crosshairs. *Id.*

In pursuit of its goals, SharkNinja announced in July 2015 that it would engage in "aggressive recruitment efforts," including hiring over 100 employees. *See* SharkNinja, *Euro-Pro Cleans Up with New SharkNinja Identity, Blending Successful Billion Dollar Product Portfolios*,

---

[1] *See also* Jon Chesto, *Coffee, Sofia Vergara style*, Boston Globe (Aug. 31, 2015) ("[SharkNinja president Mark] Barrocas didn't name Keurig Green Mountain explicitly, although it's clear that he has that other New England company, known for its pod-based coffee systems, in his sights."). https://www.bostonglobe.com/business/2015/08/31/bold-types/6YqaOT9HssbV0bq69O6NWK/story.html

CISION PR Newswire (July 22, 2015).[2]  In perhaps a moment of foreshadowing, SharkNinja had already engaged in an "aggressive recruitment" of DiFabio just three months earlier.  *See* Declaration of Scott McConchie ("Declaration"), Exhibit 1.[3]  Specifically, a former Human Resources employee at Keurig who then worked in Human Resources at SharkNinja emailed DiFabio and stated, "[w]e are looking for a senior level sales person and wanted to ***pick your brain or steal you***."  Exhibit 2 (emphasis added).[4]  To date, SharkNinja has hired at least the following former Keurig employees:  Brie Miller, Ron DiFabio, Eric Fireman, Karen Gallagher, Chad Collett, Alounsak Sivongsay, and Steve Turner, and solicited countless other Keurig employees. Compl. ¶ 34.

### III.  DiFabio and SharkNinja Sign Agreements with Keurig That They Will Honor DiFabio's Post-Employment Restrictions in Exchange for Keurig Allowing DiFabio to Work at Keurig, and Make Material Misrepresentations in Doing So.

In October 2016, DiFabio accepted a Senior Vice President position at SharkNinja.  Compl. ¶ 35.  To ensure DiFabio honored his post-employment obligations, Keurig contacted both DiFabio and SharkNinja to remind both parties that DiFabio was forbidden from commencing employment with SharkNinja prior to March 27, 2017.  Compl. ¶ 35.  Seeking a reasonable resolution, Keurig entered into separate 2016 Letter Agreements with both DiFabio and SharkNinja, whereby Keurig agreed to permit DiFabio to commence employment with SharkNinja on January 1, 2017 (the "2016 Letter Agreements"), provided certain representations were made and conditions were met

---

[2]  https://www.prnewswire.com/news-releases/euro-pro-cleans-up-with-new-sharkninja-identity-blending-successful-billion-dollar-product-portfolios-300116814.html

[3] All exhibits cited herein are attached to the McConchie Declaration.

[4] DiFabio was well aware of the importance of honoring his post-employment obligations to Keurig.  When he was being actively recruited by SharkNinja, DiFabio raised the issue of, and provided a copy to SharkNinja of, his Confidentiality Agreement with Keurig.  *See, e.g.*, Exhibit 3 (DiFabio to Brie Miller on May 5, 2015: "Brie, attached is the Confidentiality Agreement I signed that I need your legal team to look at now that you are getting into the single serve business.").

by both Defendants.  Compl. ¶¶ 35-38.  DiFabio and SharkNinja agreed, among other things, that, until after March 27, 2017, DiFabio would not have any connection with SharkNinja coffee appliances that compete with Keurig's coffee appliances and DiFabio would not induce, or assist in inducing, the termination of employment of any employee of Keurig.  *Id.*

Moreover, DiFabio explicitly represented to Keurig that, as of the date of execution of the Letter Agreements on December 13, 2016, DiFabio had "not provided any services to SharkNinja in any capacity, formal or otherwise, including as an informal consultant, advisor or volunteer to anyone at SharkNinja." Compl. Ex. C, ¶ 3; *see also id.*, Ex. D ¶ 4 (SharkNinja promising no services by DiFabio until January 1, 2017).  These representations, however, were untruthful, given that DiFabio was actively involved in SharkNinja's coffee business prior to his execution of the Letter Agreement.  Just twelve days prior to Defendants' execution of the Letter Agreements, DiFabio emailed Neil Shah, SharkNinja's Executive VP of Sales and Marketing: "*Can you send me the coffee assortment slides from your personal email to my personal email?*" Exhibit 4 (emphasis added).  Just four days prior to Defendants' execution of the Letter Agreements, DiFabio again emailed Shah, "Assortment and retailer slides like other categories; *we should be fine if we keep coffee between personal email addresses on both ends*." *Id.* (emphasis added).  Furthermore, less than a month prior to signing the Letter Agreements, DiFabio sent two emails containing Black Friday coffee product ads to Shah that he asked be forwarded to Sales VP's at SharkNinja.  First, on November 15, 2016:

> Neil, not sure if you have a service that already does this; doing this for my own due diligence.  *Please share with the Sales VP's and anyone else you feel would find value in it.*  Thanks, Ron.

Exhibit 5 (emphasis added).  Again, on November 15, 2016:

> Neil, attached is also a summary of retailer's November ads.  Again, as part of my due diligence, I wanted to make sure I had visibility to November and December

ads given the percentage of total sales these two months represent.  Again, please share with the Sales VP's and anyone else that is applicable.  Thanks, Ron.

*Id.*  Notably, and likely in an effort to avoid detection of their misconduct, both of DiFabio's November 15 emails to Shah were sent ***via DiFabio's wife's personal email account***.  *See id.*

## IV.     DiFabio, with SharkNinja's Encouragement and Assistance, Aggressively Solicits and Hires Keurig Employees in an Effort to "Get the Band Back Together."

Notwithstanding the personal[5] and contractual assurances given to Keurig, not more than ten days into his tenure at SharkNinja, DiFabio and SharkNinja began aggressively soliciting Keurig employees for the goal of, in DiFabio's words, "***getting the band back together***."  Exhibit 8 (emphasis added).[6]  For example, on January 12, 2017, DiFabio wrote, "I would love to attempt to get my old Executive Administrative Assistant to come here and support me," and noted, "I think I could get her to come here and would have her respond to an open job req [sic] ***so that it doesn't appear I went to her***."  Exhibit 9 (emphasis added).   With knowledge of DiFabio's restrictions from engaging in this solicitation and in knowing assistance of DiFabio's wrongful scheme to steal Keurig's employees, SharkNinja's Mike Conway added, "***To get around solicitation***, you can have her apply to any role and I'll take all written correspondence from here." *Id.* (emphasis added).  The next day, DiFabio emailed his former Keurig administrative assistant, Nicole Habin, and encouraged her to leave Keurig and join SharkNinja, making sure to use Ms. Habin's personal email account to avoid detection by Keurig.  *See* Exhibit 10.

---

[5] DiFabio wrote to Keurig's Julie Kurchak on November 6, 2016: "It also goes without saying that I would not release any trade secrets or share ANY information that would compromise Keurig Green Mountain, Inc., the company and brand mean too much to me."  Exhibit 6.  The following week, DiFabio said: "I have no intent on soliciting any employees of Keurig Green Mountain."  Exhibit 7.

[6] In an email from DiFabio to Keurig employee Bob Ultsch on January 24, 2017 in which DiFabio is coordinating Ultsch's interviews at SharkNinja, DiFabio assures Ultsch that many of Ultsch's Keurig colleagues soon will be joining SharkNinja, including, *by name*, Chad Collett.  *See* Exhibit 8.

DiFabio, with the encouragement and assistance of SharkNinja executives, actively recruited Keurig employees, and even provided a list of Keurig sales employees from his team at Keurig whom he requested that SharkNinja recruit to work at SharkNinja, hence "getting the band back together." *See, e.g.,* Exhibit 11. For instance, on January 15, 2017, DiFabio wrote (regarding Keurig employees): "Bob Ultsch, Chad Collett, Rob Aughe, in that order are sales leaders we could use. Steve Turner is a NAM that we could use anywhere, very strategic, long term C-Suite capable, VERY smart." *Id.* DiFabio later spearheaded a prolonged recruitment effort of Bob Ultsch, including dinners, phone calls, and secretive email exchanges. *See* Exhibit 12. On January 25, 2017, DiFabio had dinner with Rob Aughe. *See* Exhibit 13. On March 2, 2017, DiFabio introduced Turner to SharkNinja for the purpose of interviewing for a position there, and later communicated employment offers to Turner, analyzed Turner's noncompete agreement, advocated for Turner's hiring to SharkNinja's management, and facilitated and participated in Turner's interview process. *See* Exhibit 14. DiFabio also played a key role in soliciting Alounsak Sivongsay and Chad Collett, writing, "I have been in discussions with Chad to come aboard and be our Target and Best Buy Team Lead." Exhibit 15. All of the above-described solicitations of Keurig employees occurred before March 27, 2017, the date through which DiFabio and SharkNinja agreed that DiFabio would not "directly or indirectly" solicit, hire, recruit, or otherwise induce the termination of any Keurig employee.

In sum, DiFabio was involved in soliciting at least four Keurig employees, in direct breach of the Letter Agreements. In addition, Keurig is currently aware of SharkNinja having hired 7 former employees (including DiFabio and Turner), and soliciting as many as 11 more.

**V.     DiFabio and SharkNinja Immediately Disregard Their Obligations to Keurig, and DiFabio Actively Works in and Attends Internal and External Meetings regarding SharkNinja's Coffee Appliances.**

Remarkably, on January 11, 2017, just days into his employment with SharkNinja, DiFabio participated in a coffee pricing, planning, and strategy email titled, "Coffee Assortments."  *See* Exhibit 16.  DiFabio's and SharkNinja's conduct thereafter did not change.  DiFabio was a daily presence in SharkNinja's coffee business, managing internal discussions and negotiating key contracts with buyers, including one of the very buyers that DiFabio solicited information about from a Keurig employee (while DiFabio was a SharkNinja employee).  *See, e.g.,* Exhibits 17 and 23.  Even DiFabio's superiors, who should have been responsible for policing DiFabio's and SharkNinja's compliance with the Letter Agreements, consistently encouraged DiFabio's engagement in SharkNinja's coffee business and sought his confidential knowledge regarding Keurig's operations in order to advance SharkNinja's interests.  *See, e.g.,* Exhibit 18.  On at least eight separate occasions, DiFabio shared confidential insights into Keurig's operations, including: sharing the defective allowance Keurig used with a specific account; explaining Keurig's issues with another specific account; sharing payment terms Keurig negotiated with yet another specific account; discussing Keurig's margin rate on markdowns and price adjustments; sharing warehouse allowances Keurig offered to one particular account (which account SharkNinja was then negotiating with regarding warehouse allowances); and deciphering Keurig's sales metrics for SharkNinja to better understand.  *See* Exhibit 19.

**VI.    DiFabio Misappropriates, and Distributes to 47 SharkNinja Employees, Keurig's Confidential and Proprietary Information.**

Upon resignation from Keurig, DiFabio took with him 7 proprietary electronic files and what opposing counsel referred to as a "duffel bag" full of proprietary paper files.  Compl. ¶ 32. After he joined SharkNinja, DiFabio requested and received from Turner (while Turner was still a

Keurig employee) two additional confidential and proprietary Keurig files described by DiFabio as "examples of 360 degree marketing execution at retail." Exhibit 20. Each of these 9 electronic files, containing highly confidential and proprietary Keurig information, were circulated via email throughout SharkNinja. *See* Exhibits 20, 21, 24. Furthermore, on the same day that DiFabio informed a former Keurig coworker that he had received an offer from SharkNinja, DiFabio requested, and later received, the contact information for numerous buyers at accounts with which Keurig does business. *See* Exhibit 22. Keurig is aware of at least one occasion where DiFabio later engaged in negotiations with one of these buyers on behalf of SharkNinja. *See* Exhibit 23.

## VII. Turner Misappropriates Keurig's Confidential and Proprietary Information While a Keurig Employee and Sends It to SharkNinja During His Hiring Process with SharkNinja.

Like DiFabio, Turner executed a Confidentiality Agreement at the start of his employment with Keurig, which, among other things, forbids Turner from using or disclosing confidential Keurig material outside the scope of his employment with Keurig. Compl. ¶ 52. However, on March 2, 2017, while still a Keurig employee and while Turner was in discussions with DiFabio to become a SharkNinja employee, Turner used his personal email account to forward two confidential and proprietary Keurig files to DiFabio. *See* Exhibit 20. DiFabio later forwarded these two files to SharkNinja employees. *See* Exhibit 24.

On March 30, 2017, after heavy recruitment efforts by DiFabio and SharkNinja, Turner resigned from Keurig. Compl. ¶ 40. Just days before his resignation, Turner emailed a highly confidential Bed Bath & Beyond slide deck to his personal email account. Compl. ¶ 55.

### Procedural Background

After the Court issued a series of Preliminary Injunctions requiring Defendants to produce and delete a vast array of Keurig confidential information and documents which had been misappropriated from Keurig, loaded onto SharkNinja's computer system, and distributed to

SharkNinja employees, the parties then served and responded to written discovery. Keurig served its written discovery on SharkNinja on May 25, 2018. SharkNinja served its discovery responses on July 26, 2018. *See* Exhibit 25 (Responses to Document Requests) and Exhibit 26 (Responses to Interrogatories). Defendants thereafter produced documents on a rolling basis, with the latest production (by DiFabio) received by Keurig on October 26, 2018.

On September 28, 2018, counsel for Keurig sent a letter to counsel for SharkNinja outlining the many deficiencies in SharkNinja's discovery responses. *See* Exhibit 27. SharkNinja's counsel responded on October 24. *See* Exhibit 28. The parties thereafter engaged in numerous communications by telephone and email to narrow down their discovery disputes. *See* Declaration, ¶¶ 33-35.

<u>Argument</u>

**I.** **SharkNinja Should Not Be Able to Unilaterally Narrow the Scope of Keurig's Requests to Only Two Former Keurig Employees, and Avoid Discovery Regarding the Many Other Keurig Employees Defendants Wrongfully Solicited and/or Hired. (Request Nos. 1, 8, 9, 10, 17; Interrogatory No. 6)**

In an ongoing effort to avoid disclosure of its misdeeds, SharkNinja wishes to limit the scope of discovery (and, presumably, this case) to the hiring of only two former Keurig employees, DiFabio and Turner. However, Keurig's claims are not based only upon the solicitation and hiring of those two former Keurig employees. *See, e.g.*, Compl. ¶¶ 1, 2, 3, 33, 34, 40, 41. As explained in Paragraph 1:

> Keurig brings this action as result of SharkNinja's aggressive raiding of Keurig's employees and Keurig's confidential information and trade secrets. ***SharkNinja has actively solicited and, in some cases, hired multiple Keurig employees, including but not limited to Defendants DiFabio and Turner***, in blatant violation of their post-employment restrictive covenants with Keurig. [Emphasis added.]

SharkNinja and DiFabio signed the 2016 Letter Agreements on December 13, 2016. As discussed above, *less than one month later and less than two weeks into DiFabio's employment at*

*SharkNinja*, DiFabio and SharkNinja were engaging in blatant and intentional violations of their obligations under the 2016 Letter Agreements. Indeed, SharkNinja completely ignored the three key promises in its Letter Agreement, that it would ***not***:

- "induce, encourage or permit Mr. DiFabio to engage in any activity … that would violate Mr. DiFabio's obligation to maintain the confidentiality of Keurig's Confidential Information";

- prior to March 27, 2017, permit DiFabio to have any "involvement with" competitive products, "including participation in any meetings/call and/or reviewing sales data or other information concerning [competitive products]"; or

- prior to March 27, 2017, "induce, encourage or permit Mr. DiFabio to (i) directly or indirectly solicit, hire, recruit, attempt to solicit, hire or recruit, or otherwise induce the termination of employment of any employee of Keurig" or, similarly, "(ii) directly or indirectly solicit [or] contact" any Keurig customers.

SharkNinja Letter Agreement, p. 3 (¶¶ 4, 5, 7). Moreover, DiFabio and SharkNinja lied when they represented in the Letter Agreements that DiFabio had not previously "provided any services to SharkNinja in any capacity, formal or otherwise." Compl. Exs. C and D, ¶ 3. Astonishingly, only four days before they executed the Letter Agreements on Tuesday, December 13, 2016 – and made the representation that DiFabio had not provided services to SharkNinja – DiFabio admitted that he knew his communications with Shah were improper, but suggested that they use personal email addresses to communicate regarding SharkNinja's coffee business so that they could avoid detection: "***we should be fine if we keep coffee between personal email addresses on both ends***." Exhibit 4 (emphasis added).

As discovery has shown, DiFabio was actively involved in SharkNinja's coffee business, both attending meetings internally and externally and providing information regarding the business

practices at Keurig, and even information specific to shared accounts.[7] And, remarkably, DiFabio, with the assistance and encouragement of his superiors, was providing lists of Keurig employees who should be solicited and hired, reaching out and personally soliciting those Keurig employees, interviewing certain Keurig employees, advocating for the hiring of certain Keurig employees, and reassembling his Keurig sales team at SharkNinja, *i.e.*, "getting the band back together." *See, e.g.,* Exhibits 8, 11, 13-15.

For this reason, Keurig served the following requests upon SharkNinja:

1. All Documents and Communications Concerning the Complaint, the Answers and/or Concerning any of the factual allegations, claims, or defenses asserted in this Action.

8. All Documents and Communications, from January 1, 2015 to the present time, between You (including but not limited to any outside recruiter working on Your behalf) and any then-current or former representative, employee or agent of Keurig Concerning that Person's employment, potential employment and/or job opportunities with You, including but not limited to all Communications You had with: DiFabio, Turner, Chad Collett ('Collett'), Alounsak Sivongsay ('Sivongsay'), Eric Fireman ('Fireman'), Karen Gallagher ('Gallagher'), John Mizia ('Mizia'), Nicole Habin and Robert Aughe, further including, without limitation, any job description for any of the aforementioned individuals who were employed by SharkNinja.

9. Employment agreements, non-competition agreements, non-solicitation agreements, and/or confidentiality agreements signed by DiFabio, Turner, Collett, Sivongsay, Fireman, Gallagher, Mizia, and any other former Keurig employee, as part of their employment with You.

10. All Documents constituting or Concerning Keurig information which DiFabio, Turner, Collett, Sivongsay, Fireman, Gallagher or Mizia uploaded, transferred or Communicated to You or any of Your employees.

---

[7] Keurig does not even know the full extent of DiFabio's involvement with coffee products because SharkNinja had not produced *all* communications related to coffee products to which DiFabio was a party. Keurig erroneously believed that all such communications had been produced, and only learned about this issue as part of the meet and confer process. SharkNinja recently agreed to produce all such responsive documents. Keurig expects that those documents will show that DiFabio's involvement is even broader than currently known.

17.  All Documents and Communications Concerning any and all sales, accounts or customers that were brought to SharkNinja by DiFabio, Turner, Collett, Sivongsay, Fireman, Gallagher, Habin and/or Aughe.[8]

*See* Exhibit 25, Nos. 1, 8-10, 17.

Despite Keurig's allegations in the Complaint and the facts uncovered to date, SharkNinja is taking the position that discovery about the solicitations of and hiring of Keurig employees, *which we now know occurred*, is not relevant to this action.  *See, e.g.,* Exhibit 28, p. 2 ("Finally, SharkNinja will not be supplementing its response to this request to include any documents concerning SharkNinja's alleged solicitation and/or hiring of other Keurig employees or SharkNinja's alleged possession of other Keurig information beyond that taken by Mr. DiFabio and Mr. Turner.").  SharkNinja's position is untenable.

Rule 26 provides the applicable roadmap.  Discovery extends to:

> any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.[9]

---

[8] In addition to the above document requests, Interrogatory No. 12 sought information regarding all employees that SharkNinja hired from Keurig, as follows:

> Identify all Persons You have hired since January 1, 2015 who were then-employed by Keurig or who were employed with Keurig within 12 months of their hiring by You.  For each such Person, please state, with respect to their employment with You: his effective date of hire with You; his title upon hire with You, and, if that title changed, the date(s) of the title change and each new title; a description of his work duties and responsibilities for each position he has held with You; his work location(s) with You; Your division in which he works or worked; his direct supervisor(s); and his last day of employment with You, if he is no longer is employed by You.

[9] Moreover, "relevancy must be broadly construed at the discovery stage such that information is discoverable if there is any possibility it might be relevant to the subject matter of the action." *U.S. v. Massachusetts Indus. Fin. Agency*, 162 F.R.D. 410, 414 (D. Mass. 1995).  The scope of discovery is broad and reflects a policy that "[m]utual knowledge of all relevant facts gathered by both parties is essential to proper litigation." *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 227 (D. Mass. 2003) (internal quotations and citation omitted).  "As courts in this district have recognized, a party resisting discovery has

Analyzing the factors under Rule 26 leads to the obvious conclusion that SharkNinja's attempt to limit this case to the hiring of only DiFabio and Turner must fail. There can be no argument by SharkNinja that the documents and information at issue are privileged. The requests encompass those communications by SharkNinja to Keurig employees soliciting them to apply for, interview for and/or accept an offer of employment with SharkNinja. Those communications are not, and cannot be considered, cloaked with the attorney-client or any other privilege.

As explained in detail above, documents and information regarding the hiring by SharkNinja of Keurig employees are not just relevant to Keurig's claims, *they form the basis of those claims*. Moreover, those documents and information are within the exclusive possession of SharkNinja. SharkNinja and DiFabio were careful to utilize Keurig employees' personal email addresses to engage in the prohibited solicitations and communications. Thus, Keurig does not have access to those documents and information. Similarly, to the extent such unlawful solicitations resulted in an offer to join SharkNinja, SharkNinja possesses those documents and information, not Keurig. Pulling together the documents regarding the solicitations of and hiring of certain, identified former Keurig employees cannot be seen as onerous or constituting an undue burden. Finally, SharkNinja clearly has access to extraordinary amounts of email communications and other electronic documents, as well as the ability to search those email communications, as was evident in its gathering of email communications in response to the Court's prior Orders.

DiFabio and/or SharkNinja's solicitations of Keurig employees are in direct violation of their obligations under the 2016 Letter Agreements (as well as DiFabio's non-solicitation agreement). Those solicitations form the basis of, among other things, Keurig's claims for breach

---

the burden of showing some sufficient reason why discovery should not be allowed." *Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc.*, 730 F. Supp. 1165, 1186 (D. Mass. 1989).

of contract and violation of Chapter 93A.  For SharkNinja to maintain that information regarding those solicitations is not relevant – especially in light of its misconduct before and after executing the Letter Agreements (and its false representation therein) – is absurd, and runs afoul of Rule 26.[10]

## II.    SharkNinja Must Produce Communications About Indemnification Agreement(s) Among the Defendants, or at the Very Least Include Allegedly-Privileged Documents on Its Privilege Log.  (Request No. 20 and Interrogatory No. 20)

In Document Request No. 20, Keurig sought documents related to indemnification and joint defense agreements, as follows:

> All Documents and Communications Concerning all agreements in which You agreed to defend and/or indemnify DiFabio, Turner and/or any other of Your employees or prospective employees, in whole or in part, from claims brought by Keurig and/or to pay for, reimburse, or otherwise assume financial responsibility for that individual's attorneys' fees and/or liability for the claims brought in this Action, including but not limited to all joint defense agreements between You, DiFabio and/or Turner

*See* Exhibit 25, No. 20.  Keurig also propounded an interrogatory seeking similar information.  *See also* Exhibit 26, No. 20.

Initially, SharkNinja objected to these requests and refused to produce any responsive documents or information.   Very recently, however, SharkNinja agreed to produce (a) communications that memorialized a joint defense agreement among the Defendants, and (b) document(s) showing SharkNinja agreed to indemnify DiFabio and Turner.  SharkNinja, however, still refuses to produce any communications about the indemnification agreement(s) or even

---

[10] In addition, even though Keurig's Complaint focused primarily on DiFabio and Turner, that does not mean that discovery is not warranted as to other employees.  The allegations in the Complaint are enough to trigger discovery.  In *Garcia-Catalan v. United States*, 734 F.3d 100 (1st Cir. 2013), for example, the court held that in determining whether a complaint is sufficient to open the door to discovery, "the complaint must be read as a whole." *Id.* at 103.  "There need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action. For pleading purposes circumstantial evidence often suffices to clarify a protean issue." *Id.* (finding that "discovery may yield evidence of the [] allegedly tortious conduct.").

identify any responsive documents on a privilege log. SharkNinja contends that the indemnification agreement, and communications about it, are not "otherwise discoverable" per Fed. R. Civ. P. 26(b)(5)(A) and thus do not need to be included on a privilege log.

SharkNinja is wrong. An indemnification agreement certainly is "otherwise discoverable" – as evidenced by SharkNinja's begrudging agreement to produce it. In *Kaplan v. S.A.C. Capital Advisors, L.P.*, 2015 WL 5730101 (S.D.N.Y. Sept. 10, 2015), for example, the plaintiff sought documents concerning a corporate defendant "indemnifying, or potentially indemnifying" an individual defendant. *Id.* at *1. Like here, the defendants in *Kaplan* argued the requested documents (a) were not relevant, and (b) the "indemnification documents, if any, 'would be work product and privileged communications' and would fall under the common interest privilege." *Id.* Noting pre-trial discovery is broad and citing cases from around the country, the court rejected defendants' argument, ruling "Courts have found that indemnification agreements between co-defendants, including agreements regarding the payment of defense fees and costs, are relevant to credibility issues and a proper subject of discovery." *Id.* at *2 (citing cases).[11] *See also Procaps S.A. v. Patheon Inc.*, 2015 WL 11090665, *5 (S.D. Fla. Oct. 19, 2015) ("Indemnification agreements are admissible when relevant to prove a party's knowledge, … a disputed issue at trial, or to impeach a witness's credibility." (citing cases)); *Powell v. Home Depot USA, Inc.*, 2008 WL

---

[11] The cases cited in *Kaplan* were as follows: *Concepcion v. The City of New York,* 2006 WL 2254987, at *4 (S.D.N.Y. Aug. 4, 2006) (plaintiff "is entitled to explore the potential bias or prejudice of adverse parties [and][a]n indemnification agreement between co-defendants may lead to evidence of such bias."); *Brocklesby v. United States,* 767 F.2d 1288, 1292-93 (9th Cir.1985) (finding that indemnification agreement between co-defendants was admissible to show whether relationship was adverse and to attack credibility of their witnesses); *Powerlift Inc. v. Mark Indus., Inc.,* 1987 WL 12177, at *1 (N.D. Ill. June 9, 1987) (existence of indemnification agreement may reveal bias or prejudice); *United States v. Cathcart,* 2009 WL 1764642, at *2 (N.D. Cal. June 18, 2009) (discovery into source of payment of defendant's legal fees relevant to issue of credibility and bias).

11328, *4 (S.D. Fla. June 26, 2008) ("several courts have held that indemnification agreements are not privileged, and can be relevant").

The existence of any indemnification agreement also is directly relevant to Keurig's intentional interference and Chapter 93A claims, as courts routinely cite an agreement to indemnify as bearing on a party's knowledge as well as improper motive or means. *See, e.g., Sentient Jet, LLC v. Apollo Jets, LLC*, 2014 WL 1004112, *10 (D. Mass. Mar. 17, 2014) (allegation that defendant agreed to indemnify plaintiff's former employees supported "reasonable inference that the Defendants employed an improper motive or means in interfering with the Agreements"); *Corporate Tech., Inc. v. Harnett,* 943 F. Supp. 2d 233, 242 (D. Mass. 2013) ("promising to indemnify [employee] for any liability on the basis of the Non–Solicitation and Non–Disclosure Agreement" supported likelihood of success on improper motive element); *Electrostim Med. Servs., Inc. v. Lindsey,* 2012 WL 1405707, at *10 (M.D. Fla. Mar. 13, 2012) (indemnification agreement demonstrated knowledge of restrictive covenants and supported "finding of an intentional interference with the Agreement between [plaintiff] and [former employee]"); *Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 588 (E.D. Pa. 2008) (following bench trial, court finds defendant intentionally induced individual to breach obligations where, *inter alia*, it "partially indemnify[ied] him from any legal costs associated with [] violation [of restrictive covenants]"). To this end, Keurig is entitled to not only the indemnification agreement itself but communications regarding it.

Moreover, SharkNinja's argument that it need not include allegedly-privileged documents on a privilege log does not square with its argument that such information was protected by the common interest privilege. SharkNinja refused to produce responsive documents because, "to the extent any such agreement was reached by counsel for defendants' [sic] in this action 'in a

confidential manner for the purposes of furthering a common interest,' … documents concerning those communications are themselves protected by [the] joint defense or common interest privilege. Accordingly, SharkNinja will not be producing any documents concerning any indemnification, common interest, or joint defense agreement with either Mr. DiFabio or Mr. Turner." Exhibit 28, p. 4 (citation omitted). SharkNinja thus seemed to concede the materials were responsive, but argued they were privileged, and yet refuses to identify them on a privilege log.

It is not even clear, however, that communications about indemnification would be privileged. SharkNinja, DiFabio and Turner have separate counsel in this matter. Counsel for SharkNinja has never claimed to represent DiFabio or Turner, or filed a notice of appearance to that effect. Thus, if SharkNinja negotiated and/or entered into an indemnification agreement directly with DiFabio and/or Turner, the attorney-client privilege would not apply to those communications. If SharkNinja's legal counsel negotiated and/or finalized an indemnification agreement with DiFabio and/or Turner (or their legal counsel), such communications are similarly not privileged, particularly if they occurred before the parties entered into a joint defense agreement.

Moreover, SharkNinja's blanket reliance on the "common interest" privilege is unavailing in any event. "The common interest doctrine does not create a new or separate privilege, but prevents waiver of the attorney-client privilege *when otherwise privileged communications* are disclosed to and shared, in confidence, with an attorney for a third person having a common legal interest for the purpose of rendering legal advice to the client." *Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 614 (2007) (emphasis added). The doctrine applies where parties are communicating for the purpose of *furthering a common legal interest*. *See Hanover,* 449 Mass.

at 612; *Asymmetrx Medical, Inc. v. McKeon*, 2013 WL 2181084, *2 (D. Mass. May 16, 2013) ("doctrine was created to protect communications between separate defendants mounting a joint defense."); *U.S. v. Sawyer*, 878 F. Supp. 295 (D. Mass. 1995) (motion *in limine* to exclude communications denied where they were not shown to have been made during the course of a joint defense effort).

Thus, communications about an indemnification agreement are not *ipso facto* privileged. Unless SharkNinja is willing to assert that both it and the individual Defendants had a common interest in covering up the Defendants' wrongdoing, their interests were not aligned. Moreover, the doctrine "only applies where each of the parties attempting to assert the privilege was represented by separate counsel with respect to the matter of common interest." *Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V. v. Whitehead Institute for Biomedical Res.*, 2010 WL 2037103, *3 (D. Mass. May 20, 2010). In the instant case, where SharkNinja has "the burden of establishing the applicability of the common interest doctrine to the communications at issue," *id.*, SharkNinja's say-so that the common interest doctrine shields all communications in insufficient.

For this reason, SharkNinja must include all documents on a privilege log that it claims are privileged. Only then will Keurig be able to assess whether Defendants' invocations of privilege are appropriate. Moreover, of course, all non-privileged documents – communications (a) that are not in furtherance of a common interest, (b) that do not involve counsel (*e.g.*, between DiFabio or Turner and the business people at SharkNinja and/or legal counsel for SharkNinja), or (c) that occurred prior to DiFabio or Turner being represented by legal counsel – should be produced.

## Conclusion

For the reasons set forth above, Keurig respectfully requests that this Court grant its Motion to Compel.

Respectfully submitted,

KEURIG GREEN MOUNTAIN, INC.,

By its attorneys,

*/s/ Scott McConchie*
Julie B. Brennan (BBO No. 564101)
Scott McConchie (BBO No. 634127)
Manchel & Brennan, P.C.
100 River Ridge Drive, Suite 308
Norwood, MA 02062
Telephone: (617) 796-8920
jbrennan@manchelbrennan.com
smcconchie@manchelbrennan.com

Dated: December 21, 2018

## Certificate of Service

I, Scott McConchie, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 21, 2018.

*/s/ Scott McConchie*
Scott McConchie